UNITED STATES of America,
Plaintiff–Appellee,

v.

Clarence CROCKETT and Albert Tocco,
Defendants–Appellants.

Nos. 90–1733, 90–2128.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1991.

Decided Nov. 12, 1992.

Robert L. Michels (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Patrick A. Tuite (argued), Chicago, Ill., for defendant-appellant.

Kenneth H. Hanson (argued), Chicago, Ill., for defendant-appellant.

Before RIPPLE and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Albert Tocco was tried and convicted of violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (RICO), 18 U.S.C. § 1962(d) (RICO conspiracy), seventeen counts of aiding and abetting violations of 18 U.S.C. § 1951 (travelling in interstate commerce to carry on and distribute the proceeds of unlawful activity) in violation of 18 U.S.C. § 2, nine counts of extortion in violation of 18 U.S.C. § 1951, five counts of understating his income, and one count of obstruction of justice. Co-defendant Clarence Crockett was convicted of RICO conspiracy, substantive RICO, travelling in interstate commerce to carry on and distribute the proceeds of unlawful activity, extortion, and failure to file income tax returns. They appeal their convictions on a variety of grounds. For the reasons set forth in this opinion, we affirm.

# I

## BACKGROUND

We limit our presentation of the facts to those necessary to the disposition of this appeal. The evidence adduced at trial depicted the operation of a criminal enterprise headed by Albert Tocco; extortion was the principal activity of that enterprise. Because most of the targets of the organization's acts of extortion were themselves engaged in illegal activity, they were unable or unwilling to go to the police for help. The targeted entities included automotive salvage businesses involved in disassembling stolen cars and selling the parts ("chop shops"), houses of prostitution, illegal gambling operations, as well as taverns and a vending machine business. The acts of extortion were carried out with threats of violence, including murder and arson. Both violence and threats of violence were also used to maintain discipline within the organization.

Clarence Crockett and a number of other individuals worked for the enterprise by collecting monthly "street tax" payments from the victims of the organization's acts of extortion. Mr. Crockett worked closely with William Dauber, who, together with his wife, was later murdered at Albert Tocco's direction. Dauber would make the initial demand for payments, and Mr. Crockett would appear every month to collect the money. Beginning in 1977, Mr. Crockett collected monthly payments of $500 from Sheldon Fishman, who ran East Side Auto Parts, an automobile salvage yard. He also collected payments from Jerald Rosenstein and Calumet Auto Wrecking in Hammond, Indiana; Robert Brecka and Universal Auto Parts; Ronald Sowder, Robert Walker, and Fat Boys Auto; and Cheryl Gasbarro, Joseph and Michael Badali, and their illegal gambling operation.

In the fall of 1979, Joyce Valerie Walker, who ran a house of prostitution in Dolton, Illinois, received a telephone call from Dauber, who said "You don't know me, but I know you ... I know what you're doing, and you have to pay." Tr. Vol. 8 at 1294. He told her that a man would come to her door once a month, around the middle of the month. A few days later, Mr. Crockett knocked on her door and announced, "I'm the man." *Id.* at 1300. Walker asked, "The man for what?," and Mr. Crockett said again, "I'm the man." Walker replied, "I don't know what you are talking about." Mr. Crockett again said, "I am the man," and then she understood and gave him an envelope with $400 in it. *Id.* Thereafter, for approximately a year and a half, Mr. Crockett collected from Walker every month.

Mr. Crockett was not involved in Mr. Tocco's extortion of Herbert Panice. In 1980, Panice opened the Show Club, a house of prostitution, in Chicago Heights. Panice approached Mr. Tocco, whom he knew by reputation as the boss of Chicago Heights, for help in obtaining a liquor license. Mr. Tocco accompanied Panice to a

meeting with the mayor of Chicago Heights, at which the Mayor told Panice that it was unlikely he would get a license. After the meeting, Mr. Tocco told Panice he would see what he could do. In a few weeks, Panice was granted a license to serve liquor until 2:00 a.m. Later he was given a 4:00 a.m. license. Four or five months after Panice was given the license for the Show Club, Mr. Tocco came to the Show Club and announced that he and Panice were now partners and that Panice would have to pay him $4,000 a month. Panice agreed. He testified that Mr. Tocco never threatened him, that he was not in fear of Mr. Tocco, and that he understood that the purpose of the payments was to "help keep my license," Tr. Vol. 9 at 1528, or to "protect my license." Id. at 1568. Panice made the payments until the Show Club was raided by the FBI in August 1984, after which business fell off and Panice became embroiled in legal problems.

Charles Bills also worked for Mr. Tocco, first with Dauber and then with Mr. Crockett, collecting street tax from chop shops. Bills also collected street tax from taverns. He testified that when one tavern owner, Steven Pasek, refused to pay, Mr. Tocco told Bills that Pasek "has to pay the taxes. He can't get out of it. And you gotta go give him a message. Break his legs. Do something, but he has got to pay the taxes." Tr. Vol. 4 at 319. Consequently, Bills set fire to the garage at Pasek's parents' home, where Pasek kept his favorite Cadillac. Pasek then resumed making payments of street tax.

At trial, evidence was also presented concerning four murders. Dino Valente, the owner of a vending machine business, refused to cede his vending machine routes to Mr. Tocco. According to the testimony of Robert Hardin, Mr. Tocco had Valente shot to death one night after meeting with Mr. Tocco at a restaurant owned by Mr. Tocco. After the murder, Mr. Tocco bought Valente's vending machine routes from Valente's widow. Hardin also testified that he helped Nick D'Andrea murder August Maniaci in Milwaukee. Maniaci apparently owed Mr. Tocco money. According to Hardin, this murder was also committed at Mr. Tocco's direction. William

Dauber and his wife were murdered on orders from Mr. Tocco after Dauber began cooperating with the FBI. Dauber's car was run off the road, and he and his wife were shot to death. Mrs. Tocco testified that Dauber had told her that he knew he was going to be "whacked" and that Mr. Tocco "would be the one to do it." Tr. Vol. 14 at 2535. Mrs. Tocco also testified that Mr. Tocco told her that Dauber was killed because he was a "snitch" and had been "stepping on too many people's toes." Id. at 2537.

Mr. Tocco flew to Greece on September 17, 1988, after withdrawing hundreds of thousands of dollars from his bank accounts. He was indicted on October 17 and failed to appear for his arraignment. When Mr. Tocco's eight-year-old son was sent to Greece to join him, FBI agents discovered Mr. Tocco's whereabouts. Mr. Tocco was expelled from Greece. He flew to Rome and, accompanied by FBI agents, returned to the United States, where he was placed in pre-trial detention at the Metropolitan Correctional Center in Chicago. While in pre-trial detention he instructed his wife to pass along a message to two of his associates that it would be "nice" if Panice (the owner of the Show Club who made monthly payments to Mr. Tocco) had a heart attack. Tr. Vol. 14 at 2567. Mr. Tocco also asked his wife to have one of his associates arrange for another prospective witness, Joseph Badali, to change his testimony. Tr. Vol. 15 at 2598–99.

On December 7, 1989, a jury found Mr. Tocco guilty of thirty-four of the counts charged. The district court subsequently sentenced Mr. Tocco to 200 years' imprisonment and also imposed a substantial fine. Mr. Crockett was found guilty on twenty-three of the counts charged against him, and the district court sentenced him to twenty years' imprisonment. Both Mr. Tocco and Mr. Crockett now appeal their convictions.

## II

## ANALYSIS

### A. *Albert Tocco*

Mr. Tocco presents several arguments in this appeal. He argues that Count One

(RICO conspiracy) of the indictment was insufficiently specific in defining the pattern of racketeering activity alleged and that it was constructively amended at trial. Mr. Tocco also contends that the admission of certain evidence was erroneous because its probativeness was outweighed by its prejudicial effect. Additionally, Mr. Tocco challenges the sufficiency of the evidence on several of the extortion counts and on the relation of certain predicate acts to the RICO enterprise. In his final argument, Mr. Tocco raises a constitutional challenge to the district court's decision to impanel an anonymous jury.

### 1. Count One: RICO conspiracy

Mr. Tocco challenges his conviction on Count One (RICO conspiracy) on several grounds. First, Mr. Tocco contends that the trial court erred in not dismissing the RICO conspiracy count; he argues that, because the count failed to specify the acts that comprised the pattern of racketeering activity, it did not state an offense under 18 U.S.C. § 1962(d). Second, he challenges the admission of evidence concerning two murders not specified in the indictment as part of the pattern of racketeering alleged under Count One. He submits that the admission of this evidence resulted in a constructive amendment of the indictment. Third, he contends that this evidence was extremely prejudicial and therefore its admission was erroneous under Federal Rule of Evidence 403.

Given the nature of Mr. Tocco's contentions, we initially set forth a description of the indictment. Count One of the superseding indictment against Mr. Tocco and Mr. Crockett alleged that the two defendants "were associated in fact with each other and with other persons, including William Dauber, Charles 'Guy' Bills, Charles Soteras and Nicholas D'Andrea, in a criminal organization," which the government denominated "the Tocco Organization," and that this association in fact was an "enterprise" under 18 U.S.C. § 1961(4).[1]

R.100 at 1. Paragraphs four and five of Count One (under the heading "How the Tocco Organization Functioned") furnished a general description of this enterprise and its operation, methods, and structure. Paragraph four included the statement that "[t]he TOCCO ORGANIZATION would use violence and the threat of violence, including arson and murder, against persons who resisted its economic demands or who opposed defendant ALBERT TOCCO." R.100 at 2. Paragraphs six to twelve (under the heading "The Conspiracy Conducted by the Tocco Organization") described the conspiracy that the government alleged was conducted by the Tocco organization. Paragraph six alleged the agreement to "conduct and participate, directly and indirectly, in the affairs of the TOCCO ORGANIZATION through a pattern of racketeering activity" and specified the time frame of the conspiracy (beginning in the mid–1970s and continuing until about April 1986), the location ("Chicago Heights and elsewhere within and without the Northern District of Illinois, Eastern Division"), and the general kinds of racketeering acts that formed the pattern of racketeering activity (murder, extortion, and arson). R.100 at 3. Paragraphs seven through twelve listed with greater specificity the kinds of racketeering acts that formed the "pattern of racketeering activity:" paragraph seven identified the victims of extortion, mainly automobile salvage yards, houses of prostitution, taverns, and gambling operations, while paragraphs eight through twelve listed more general types of acts. No specific acts of murder are identified in Count One, although paragraph eleven repeats the general allegation that members of the Tocco organization "would threaten and use violence, including arson and murder, to enforce their economic demands" and paragraph twelve alleges that the members of the organization "would attempt to conceal the operation of the TOCCO ORGANIZATION from the authorities, by steps including: (a) using and threatening to use vio-

---

**1.** Section 1961(4) states that "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

lence against persons who might cooperate with the authorities...." R.100 at 5.

### a. specificity of Count One

■ Mr. Tocco challenges the scope of the allegations in Count One. He argues that Count One fails to state an offense under 18 U.S.C. § 1962(d) because it fails to define sufficiently "the pattern of racketeering activity as a limited set of particular predicate acts." Appellant Tocco's Br. at 36. In support of this argument, Mr. Tocco relies particularly on a passage in *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.), *cert. denied*, 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371, 372 (1986), where we rejected the argument that the government need not specify predicate crimes in a RICO conspiracy indictment and that it would be sufficient for the indictment to state that the defendant engaged in "various acts of bribery:"

> This argument misconceives the nature of any RICO offense. Under the statutory scheme the predicate acts are not only important "elements of the crime" but they are also, by definition, distinct offenses. Because RICO provides increased penalties for the commission of these predicate crimes in a specified context, ... the failure to specify the underlying criminal activity in the indictment can effectively preclude the exact identification of what is being charged.

*Id.* at 501. Thus, *Neapolitan* does require some amount of specificity in the indictment's allegations of predicate acts. In *United States v. Glecier*, 923 F.2d 496 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct.

54, 116 L.Ed.2d 31 (1991), this court addressed the question of how much specificity is required. The language quoted above from *Neapolitan*, we explained, "[a]t most ... sets an outer boundary for RICO conspiracy indictments at a mere allegation of 'various acts of bribery.'"[2] *Glecier*, 923 F.2d at 501. We observed that

> [i]f the government were required to identify, in indictments charging violation only of section 1962(d), specific predicate acts in which the defendant was involved, then a 1962(d) charge would have all of the elements necessary for a substantive RICO charge. Section 1962(d) would thus become a nullity, as it would criminalize no conduct not already covered by sections 1962(a) through (c). Such a result, quite obviously, would violate the statutory scheme in which conspiracy to engage in the conduct described in sections 1962(a) through (c) is itself a separate crime. As mentioned above, that separate crime centers on the act of *agreement*, which makes unnecessary—and in many cases impossible—the identification in the indictment of specific predicate acts that have come to fruition.

*Id.*

Count One, like the indictment at issue in *Glecier*, "contains sufficient information to fall well within that boundary." *Id.* It alleged acts of violence carried out during a specific period of time for specific purposes in furtherance of the delineated activities of the RICO enterprise.[3] *See id.* We therefore conclude that Count One did not fail to define sufficiently a pattern of

---

**2.** In *Glecier*, 923 F.2d at 501, we also explained the particular nature of the problem in *Neapolitan:*

> [i]t so happens that the RICO conspiracy count at issue in *Neapolitan* did list particular acts of bribery in which Neapolitan and the other defendants were involved, which explains why the government got into trouble when it sought to prove the conspiracy charge against Neapolitan with evidence of other crimes not contained in the count. Thus, we found that these unspecified crimes were "largely irrelevant to the establishing of the RICO conspiracy *alleged by the government in this case*." (citation omitted) (emphasis in original).

**3.** *See also United States v. Phillips*, 874 F.2d 123, 130 (3d Cir.1989) (where RICO conspiracy count generally identified racketeering acts as acts of bribery and extortion, government "can rely on any act of bribery and extortion, so long as that act occurred within the time frame of the conspiracy and was established by proofs at the trial"); *United States v. Sutherland*, 656 F.2d 1181, 1197 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982) (rejecting similar lack of specificity challenge to RICO conspiracy indictment where indictment identified the pattern of racketeering activity as "a number of bribes that occurred between November 1975 and January 1980").

racketeering activity: it did allege a cognizable offense under 18 U.S.C. § 1962(d).

### b. constructive amendment of the indictment at trial

■ The Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." Under the Grand Jury Clause of the Fifth Amendment, the possible bases for conviction are limited to those contained in the indictment. *See United States v. Leichtnam,* 948 F.2d 370, 379 (7th Cir.1991) (citing *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)). "An indictment may not be 'amended except by resubmission to the grand jury.'" *Leichtnam,* 948 F.2d at 376. Narrowing the indictment so that the trial jury deliberates on fewer offenses than the grand jury charged does not constitute amendment. *Id.* at 377. But the indictment may not be broadened so as to present the trial jury with more or different offenses than the grand jury charged. *Id.* "Any 'broadening [of] the possible bases for conviction from that which appeared in the indictment' is fatal" and is reversible per se. *Id.* (quoting *Miller,* 471 U.S. at 138, 105 S.Ct. at 1816).

Mr. Tocco argues that the murders of August Maniaci and Dino Valente were not contained in the terms of Count One and that the jury might have based its conviction on Count One on those murders, considering them part of the pattern of racketeering activity. Mr. Tocco argues that Count One of the indictment, although broadly worded, was confined to extortion of individuals involved in unlawful activities such as automobile salvage yards, chop shops, gambling operations, and houses of prostitution.[4] It was "not so broad," he asserts, "as to allege that Tocco enforced his economic demands in the area of vending machines." Appellant's Reply Br. at 3. Thus, according to Mr. Tocco, the introduction of evidence concerning the murder of Valente, allegedly committed when Valente

refused to cede his vending business territory to Mr. Tocco, was not covered by the language of the indictment.

■ We cannot agree with Mr. Tocco's contention that the murders of Maniaci and Valente were beyond the allegations of Count One and thus constituted a constructive amendment of the indictment. Count One of the indictment included Valente (and thus his vending machine business) among the businesses and people enumerated as the objects of Mr. Tocco's demands for "street tax." R.100 at 5. Count One also alleged that the Tocco Organization "would use violence and the threat of violence, including arson and murder, against persons who resisted its economic demands or who opposed defendant ALBERT TOCCO." R.100 at 2. Failure to allege the particular demand that Valente resisted ceding his vending machine routes to Mr. Tocco, does not bring his murder outside the indictment's terms.

■ Mr. Tocco raises a similar challenge to the introduction of the murder of August Maniaci. He asserts that Maniaci's murder was not relevant to the RICO enterprise alleged in the indictment and was thus outside the scope of Count One. First, Mr. Tocco submits that, because the Maniaci murder took place in Milwaukee, it is outside the geographic scope of the conspiracy charged in the indictment. However, while the indictment charges a conspiracy that clearly is centered in Chicago, the terms of the indictment are broad enough to encompass Milwaukee. *See* R.100 at 3 ("at Chicago Heights and elsewhere within *and without* the Northern District of Illinois, Eastern Division) (emphasis added). Indeed, although Milwaukee is not specifically mentioned in the indictment, Count One makes clear that the scope of the conspiracy extended beyond Chicago and beyond Illinois. *Id.* (¶ 7(b), alleging as part of pattern of racketeering the extortion of an Indiana auto parts dealer).

Moreover, the evidence presented by the government tended to show that Maniaci's

---

**4.** Mr. Tocco does not argue that the broad terms of the Count One RICO conspiracy should be

read as implicitly limited by the more specific terms of Count Two.

murder was a consequence of his refusal or inability to repay a loan from Mr. Tocco. As the government points out, Count One of the indictment included in its allegation of a pattern of racketeering both a statement that "[i]t was further a part of the conspiracy that the TOCCO ORGANIZATION would make its financial resources available to various persons and businesses by loaning money at extortionate rates, so as to obtain control over those persons and businesses," R.100 at 5, and, as noted above, a statement that "[i]t was further a part of the conspiracy that members of the TOCCO ORGANIZATION would threaten and use violence, including arson and murder, to enforce their economic demands." *Id.* Thus, the inclusion of Maniaci's murder did not constructively amend the indictment at trial.

### c. admission of evidence under Rule 403

Mr. Tocco also challenges the introduction of evidence of the Valente and Maniaci murders under Federal Rule of Evidence 403.[5] Assuming that the evidence was relevant to the conspiracy charged in the indictment,[6] Mr. Tocco argues that its probative value was substantially outweighed by its extreme prejudice to him. He also argues that this evidence was cumulative and thus should have been excluded.

"Balancing the probative value of evidence against its possible prejudicial impact is a matter left to the district court's sound discretion." *United States v. Hickerson,* 732 F.2d 611, 615 (7th Cir.), *cert. denied,* 469 U.S. 846, 105 S.Ct. 159, 83 L.Ed.2d 95

(1984). "[B]ecause it is a 'comparison of intangibles,' a district court's Rule 403 balancing is afforded a special degree of deference: 'Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'" *United States v. Glecier,* 923 F.2d 496, 503 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (quoting *United States v. Krenzelok,* 874 F.2d 480, 482 (7th Cir. 1989)). Here, given our determination that the murders were within the broad terms of Count One, it is clear that no unfair prejudice resulted from the district court's decision allowing the government to introduce evidence of them. As this court stated in *United States v. Benson,* 941 F.2d 598, 609 (7th Cir.1991), *opinion amended,* 957 F.2d 301 (7th Cir.1992), "[d]irect proof of the charged offense does not create the *unfair* prejudice Rule 403 is meant to prevent." Moreover, the government is entitled to try to prove all the racketeering acts making up the pattern of racketeering, so that it may obtain a conviction even if the jury rejects some of its theories. *See id.* "The government is not required to try [a defendant] with less than all of its evidence." *Id.* Thus, we conclude that the district court properly allowed admission of this evidence. The evidence was neither unduly prejudicial nor cumulative. Mr. Tocco's argument must fail.

### 2. The Panice extortion
### a. sufficiency of the evidence

Mr. Tocco challenges the sufficiency of the evidence supporting his convictions on

---

**5.** Fed.R.Evid. 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**6.** Mr. Tocco argues that Maniaci's murder itself was not within the terms of the indictment and, therefore, was not relevant to proving the existence of a conspiracy. He bases this claim on the ground that the government offered "no direct evidence" at trial to prove that Mr. Tocco lent money to Maniaci or that Maniaci's murder was a consequence of his failure to repay a loan

to Tocco. However, Robert Hardin testified at trial that he drove Nicholas D'Andrea, an alleged associate of the enterprise, to Milwaukee where D'Andrea shot Maniaci to death. At trial, Hardin stated that Maniaci had been "skimming" ("taking money they shouldn't be"), but maintained that he did not recall "who was taking money from whom." Tr. Vol. 11 at 1843. The prosecution introduced Hardin's prior statement, made under oath before the grand jury, that "[t]he guy [Maniaci] was killed over money that he owed Nick D'Andrea and Albert Tocco, about $12,000. You see, Nick D'Andrea had loaned him first $4,000, and the guy was paying, but wouldn't pay all of it. It was a juice loan." *Id.* at 1844.

Counts Thirty-one through Thirty-nine. In pressing a sufficiency of the evidence claim, Mr. Tocco "must shoulder a 'heavy burden' to succeed in having the jury's verdict reversed." *United States v. Davis,* 890 F.2d 1373, 1377 (7th Cir.1989) (quoting *United States v. Doerr,* 886 F.2d 944, 968 (7th Cir.1989)), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990). "This court will disturb a jury's verdict only when the trial record contains no evidence, no matter how it is weighed, from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Davis,* 890 F.2d at 1377–78. Moreover, "the evidence of record must be reviewed in [the] light most favorable to the prosecution, with all reasonable inferences drawn in the prosecution's favor." *Id.* at 1378.

Counts Thirty-one through Thirty-nine alleged that Mr. Tocco "knowingly affected and attempted to affect commerce by extortion by obtaining property from the Show Club through Herbert Panice with his consent, which was induced by the wrongful use of fear," in violation of 18 U.S.C. § 1951.[7] R.100 at 73–81. This allegation is also found in Racketeering Acts Thirty-two through Seventy-four of Count Two. R.100 at 14–22. Mr. Tocco contends that the evidence did not show that Panice's payments to him were induced by a wrongful use of fear. Mr. Tocco argues that Panice's testimony shows merely that Panice compensated Mr. Tocco for his help in obtaining and maintaining a liquor license; he emphasizes that Panice testified that he never was afraid of Mr. Tocco, that Mr. Tocco never threatened him, and that no one, including Mr. Tocco, ever told him that his license would not be renewed if he did not pay Mr. Tocco. Moreover, it was Panice who approached Mr. Tocco for help with the liquor license, and Mr. Tocco waited a year after Panice had obtained the license to ask for compensation for his services.

It is well settled that the fear required by section 1951 can be satisfied by putting the victim in fear of economic harm. *See United States v. Stodola,* 953 F.2d 266, 271 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Lisinski,* 728 F.2d 887, 890 (7th Cir.) ("This circuit and others have long recognized that the term 'fear' in the Hobbs Act includes fear of economic harm or loss."); *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984). The wrongful use of fear of economic harm is established by showing that the defendant preyed upon or exploited the victim's fear of economic harm. *See United States v. Nedza,* 880 F.2d 896, 902 (7th Cir.), *cert. denied,* 493 U.S. 938, 110 S.Ct. 334, 107 L.Ed.2d 323 (1989); *Lisinski,* 728 F.2d at 890. Mr. Tocco argues that the government has not established fear of economic harm because Panice made payments to Mr. Tocco out of a hope of economic gain by maintaining his liquor license, not fear of economic loss. Mr. Tocco relies on *United States v. Garcia,* 907 F.2d 380 (2d Cir.1990), and *United States v. Capo,* 817 F.2d 947 (2d Cir.1987) (payment for assistance in obtaining job not made through fear of economic loss). In *Stodola,* this circuit explained *Garcia:*

> In *Garcia,* a company made payments to a congressman to induce the congressman to use his influence to help it obtain a government contract. The Second Circuit held that there was no extortion under the economic loss prong because the company was not risking loss of anything to which it was legally entitled.

*Stodola,* 953 F.2d at 271. Mr. Tocco argues that Panice had no legal entitlement to a liquor license; therefore, the circum-

---

7. Section 1951 provides:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 Extortion is defined by section 1951(b)(2) as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

stances are analogous to *Garcia.* We disagree. The actual payments made by Panice, after the license had been granted, fall squarely under *Lisinski.* In *Lisinski,* the owner of a restaurant, who was in jeopardy of losing his liquor license because of a large Illinois sales tax liability, asked the defendant for help. The defendant, who worked for the Clerk of the Circuit Court of Cook County and had friends in the Illinois Liquor Control Commission, had the license "unblocked." A few days later he asked the restaurant owner for a thousand dollars to "take care of some people." The following year, shortly before the liquor license was due to expire, the defendant called and asked for another payoff. We upheld the jury's verdict on the ground that this second payoff had been induced through the restaurant owner's fear of economic loss, which the defendant had exploited.[8] *See Lisinski,* 728 F.2d at 890.

In the present case, Panice testified that, some months after Mr. Tocco helped him get the license, he and Mr. Tocco had a conversation in Panice's office at Show Club. Mr. Tocco, he testified, "kind of had a smile on his face. He says, 'We're partners now, and it's going to cost you four Gs a month.'" Tr. Vol. 9 at 1528. Later the payment was raised to $5,000. According to Panice, he made the payments to Mr. Tocco in order "to protect his license." *Id.* at 1568. Thus, there was adequate evidence to permit a rational trier of fact to find that the payments were induced by fear of economic harm.

### b. the Panice extortions as predicate acts

■ Count Two of the indictment against Mr. Tocco, which alleged a substantive RICO violation, listed the Panice payments as predicate acts of extortion. *See* R.100 at 14–22 (racketeering acts 32 to 74). In a special verdict, the jury found that Mr. Tocco was guilty of those predicate acts. Mr. Tocco challenges the jury's verdict on the ground that there was insufficient evidence to show the required nexus between the acts and the conduct of the RICO enter-

prise. This court has adopted a three-part test for determining whether there is a nexus between a racketeering activity and the affairs of the enterprise. *See Overnite Transp. Co. v. Local No. 705,* 904 F.2d 391, 393 (7th Cir.1990); *United States v. Horak,* 833 F.2d 1235, 1239 (7th Cir.1987); *United States v. Blackwood,* 768 F.2d 131, 137–38 (7th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); *see also United States v. Cauble,* 706 F.2d 1322, 1331–33 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). To establish a nexus, it is required that "(1) [t]he defendant must have committed the racketeering acts; (2) the defendant's position in or relationship with the enterprise facilitated the commission of the acts; and, (3) the acts had some effect on the enterprise." *Overnite,* 904 F.2d at 393. "Effect on the enterprise is established by proof that 'the racketeering acts affected the enterprise in some fashion.'" *United States v. Pieper,* 854 F.2d 1020, 1026 (7th Cir.1988) (quoting *Blackwood,* 768 F.2d at 138)).

Mr. Tocco argues that the evidence is insufficient to support a finding that the second and third nexus requirements are satisfied. Although, as Mr. Tocco points out, Panice "never testified that he believed that Tocco's influence in obtaining the liquor license derived from Tocco's position in some criminal organization," Appellant Tocco's Br. at 27–28, Panice testified that he had heard that Tocco was "the [organized crime] boss of Chicago Heights." Tr. Vol. 9 at 1509. He also testified that, with Mr. Tocco's influence, he obtained first a 2:00 a.m. license and later a 4:00 a.m. license. Thus, there was sufficient evidence to allow a rational finder of fact to conclude that Mr. Tocco's position in the RICO enterprise charged here facilitated his extortion of Panice.

There is also sufficient evidence to support a finding that the third requirement of the nexus test was met. On appeal, Mr. Tocco seeks to characterize the extortion of Panice as a purely private endeavor on his part. However, extortion of houses of

---

8. In *Lisinski,* the jury acquitted the defendant as to the first payment. 728 F.2d at 889.

prostitution was, as the evidence showed, a basic part of the operation of the enterprise, and Mr. Tocco's extortion of Panice apparently was known to his associates: Guy Bills, one of Mr. Tocco's street tax collectors, testified that he and Mr. Tocco went to the Show Club six or eight times together and that Mr. Tocco told him that Panice was "under his wing," which meant, according to Bills, that "he belonged to Mr. Tocco," in other words, "he was paying Mr. Tocco." Tr. Vol. 4 at 343. Moreover, Panice let others who might attempt to extort money from him know that he was "with the guys in the Heights." Tr. Vol. 9 at 1556, 1557. Thus, the scope of the Tocco organization was enlarged in the eyes of others by Panice's "belonging" to Mr. Tocco. The requirement that an act have "some effect" on the RICO enterprise, *Overnite*, 904 F.2d at 393, is thus satisfied.

### 3. Evidentiary ruling

 Mr. Tocco also challenges the admission of testimony regarding statements made by William Dauber, one of Mr. Tocco's street tax collectors whose murder, along with his wife's, was listed as a predicate act under Count Two of the indictment (substantive RICO). At trial, three witnesses, Betty Tocco (Mr. Tocco's wife), Dennis Laughrey (an FBI agent), and Robert Hardin (an auto thief and "hit man" who worked for Mr. Tocco) testified that Dauber was afraid Mr. Tocco was going to have him killed. This testimony was admitted under Federal Rule of Evidence 803(3) "solely as proof of William Dauber's state of mind to show his knowledge as to the scope of the enterprise charged in the indictment." [9] Tr. Vol. 20 at 3530 (jury instructions). It was not admitted to prove that Mr. Tocco in fact had Dauber murdered, and the jury was instructed not to consider it for that purpose. However, when the government made its closing argument, it referred to these statements as corroboration for the allegation that Mr. Tocco had arranged the Daubers' deaths. Mr. Tocco objected to this portion of the government's closing argument, and the objection was sustained. On appeal, Mr. Tocco submits that none of this testimony should have been admitted under Federal Rule of Evidence 403 because Dauber's statements had only minimal probative value toward the purpose for which they were admitted, while their prejudicial effect was "enormous." Appellant Tocco's Br. at 47.

 "[W]e review decisions to admit evidence only to determine whether by admitting the evidence the district court abused its discretion...." *United States v. York*, 933 F.2d 1343, 1348 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *accord United States v. Farmer*, 924 F.2d 647, 653–54 (7th Cir. 1991). The text of Rule 403 makes plain that its application is limited to cases in which the probative value of the evidence is "substantially outweighed" by its prejudicial effect. *York*, 933 F.2d at 1352. "Assessing the relative impact of the legitimate and illegitimate inferences supported by evidence, is at best, an imprecise task, one that, to a large extent, requires a contemporaneous assessment of the presentation, credibility, and impact of the challenged evidence." *Id.* We therefore accord great deference to a district court's decision to admit evidence under Rule 403. *Id.* Under this standard, we cannot agree with Mr. Tocco that the admission of the statements in question was erroneous under Rule 403. Given the direct evidence of Mr. Tocco's involvement in the murders of the Daubers, the admission of Dauber's statements was not likely to have a prejudicial effect substantially outweighing its probative value in regard to the methods used to enforce internal discipline in the RICO enterprise. Moreover, the district court did instruct the jury on the limited use that it could make of the evidence. Finally, we note that even erroneous evidentiary rulings will not be overturned if any resulting error was harmless. *Farmer*, 924 F.2d at 654; *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir.1989). Here,

---

**9.** Mr. Tocco does not raise any challenge to the propriety of admitting this evidence under Federal Rule of Evidence 803(3).

when we consider not only the cautionary instructions but the other evidence linking Mr. Tocco to the murders, if there was any error, it was clearly harmless.

4. Impanelment of an anonymous jury [10]

■ Mr. Tocco urges that the district court's decision to impanel an anonymous jury requires reversal. He submits that use of an anonymous jury was not justified by the circumstances of the case. In particular, Mr. Tocco asserts that there was no evidence before the court that he had attempted to tamper with a jury when he had been tried in the past or that he would do so then. Nor, Mr. Tocco claims, was there any evidence that he had the means to tamper with this jury, given that he "was completely cut off from his alleged network of associates as a result of his own actions in leaving the country before his indictment, the indictment itself, and the trial court's pretrial commitment of [him] in an isolation cell...." Appellant Tocco's Br. at 39. He also argues that the district court "specifically disavowed that [it] had any concern that Tocco would attempt to influence the jury," *id.*, and that the only similarity between his situation and *United States v. Scarfo,* 850 F.2d 1015 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988), on which the district court relied in its decision to institute

an anonymous jury, was that there was evidence that he was involved in organized crime. Mr. Tocco submits that this connection to organized crime was not enough in itself to justify the burden that impanelment of an anonymous jury placed on his constitutional rights to a presumption of innocence, to a public trial, to an impartial jury, and to equal protection of the law.

Anonymous jury impanelment is an issue of first impression in this circuit, but our analysis is aided by the methodology developed by our colleagues in other circuits. The Second Circuit has articulated the following general principles: "the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991) (collecting cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). "Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Id.* "We review the district court's decision for abuse of discretion, and must be 'particularly deferential' to the trial court's 'substantial discretion' to empanel an anonymous jury." *United States v. Eufrasio,* 935 F.2d 553, 573 (3d

---

10. In the usual circumstance, the parties have available to them the names, addresses, and occupations of potential jurors. This information is useful during voir dire. In the process of impaneling a jury, the parties can use this information in formulating questions with which to probe potential jurors for possible prejudices, biases, or any other factors that might make a juror unable to render a fair and impartial decision. In some criminal trials, however, special precautions must be taken in order to protect jurors from harassment, intimidation, anxiety, and a host of other disruptive influences. These concerns commonly arise in trials relating to large-scale organized crime or narcotics enterprises. To protect potential jurors and their families, a court may decide to withhold from the parties some of the identifying information about each juror both before and after conducting voir dire. In some cases, courts have withheld (among other information) jurors' names, addresses, places of employment, ethnic backgrounds, and religions. *See, e.g.,*

*United States v. Tutino,* 883 F.2d 1125 (2d Cir.) (jurors' names, addresses, and places of employment withheld), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Scarfo,* 850 F.2d 1015 (3d Cir.) (jurors' names and addresses withheld), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.) (jurors' names, addresses, and places of business withheld), *cert. denied sub nom. Fisher v. United States,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979) (jurors' names, addresses, religions, and ethnic backgrounds withheld), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Childress,* 746 F.Supp. 1122 (D.D.C. 1990) (jurors' names and addresses withheld); *United States v. Edmond,* 730 F.Supp. 1144 (D.D.C.1990) (jurors' names, addresses, and current occupations withheld). The withholding of this identifying information, particularly the jurors' names, gives rise to the term "anonymous jury."

Cir.) (quoting *Scarfo,* 850 F.2d at 1023), *cert. denied sub nom. Idone v. United States,* —— U.S. ——, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *see also Scarfo,* 850 F.2d at 1023 ("In circumstances similar to those here, we must be particularly deferential to the trial judge, familiar as he is with the local ambience.").

In *Paccione,* the Second Circuit approved the impanelment of an anonymous jury because the government had reliable reason to believe defendants had strong ties to organized crime, defendants were facing the possibility of lengthy sentences and high monetary penalties, witnesses had been killed or threatened, and the case had been and could be expected to be the subject of extensive publicity "exposing the jurors to inappropriate contacts that could compromise the trial." *Paccione,* 949 F.2d at 1193. In *United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992), the court determined that the use of an anonymous jury was justified by expected publicity and by the fact that the defendant's coconspirator had attempted to further the RICO conspiracy by tampering with a grand jury. The *Vario* court noted that mere invocation of the words "organized crime," "mob," or "Mafia," without something more, does not warrant impaneling an anonymous jury. However, the court opined that

> [t]his "something more" can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety. Such proof would be sufficient in and of itself in an appropriate case to warrant an anonymous jury regardless of whether the defendant was a reputed mobster or associated with a recognized organized crime family.

*Vario,* 943 F.2d at 241.

In the present case, there was ample justification for the district court's impanelment of an anonymous jury. As the government points out, the evidence at trial was to include (and did include) a depiction of a pattern of violence by members of the Tocco organization, including the murder of a potential witness, William Dauber, who at the time of his death was cooperating with the authorities. Moreover, there was evidence of attempts by Mr. Tocco to influence or intimidate witnesses. While in pretrial detention, Mr. Tocco asked his wife to "relay a message" to two of his associates that "it would be nice if Mr. Panice had a heart attack." Tr. Vol. 14 at 2567. Herbert Panice was a witness at the trial and an alleged victim of extortion by Mr. Tocco. Mrs. Tocco also testified that Mr. Tocco asked her to pass on a message that witness Joseph Badali should be persuaded to change his testimony. Tr. Vol. 15 at 2599. Furthermore, as the district court stated during jury selection, there had been pretrial publicity about the case. This publicity could be expected to continue throughout the trial.

Moreover, the district court was careful to protect the defendant from the possibility of prejudice resulting from the impanelment of an anonymous jury. Although the jurors' names, exact addresses, and places of employment were not made known, the district court conducted a thorough voir dire. As the Second Circuit has stated, a "defendant's fundamental right to an unbiased jury is adequately protected by the court's conduct of ' "a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself." ' " *Paccione,* 949 F.2d at 1192 (quoting *Vario,* 943 F.2d at 242 (quoting *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980))). Mr. Tocco has not alleged that the voir dire conducted by the court was inadequate, and our examination of the record reveals that the voir dire was searching and thorough. Furthermore, the district court repeatedly instructed the jury, at voir dire, at the beginning of the trial, after the completion of the government's case in chief, before closing arguments, and in the jury instructions, that Mr. Tocco enjoyed a presumption of innocence. Finally, the district court gave the

jury an explanation for their anonymous status which implied that it was "not the result of threats from the defendants," *Paccione*, 949 F.2d at 1193, but rather was one of a number of procedures used by the federal courts to avoid any contact between the jurors and the parties to ensure that "both sides in the case receive a fair and impartial determination by the members of the jury." Tr. Supplemental Record (November 6, 1989) at 4–5.

In short, the district court did not abuse its discretion in deciding to impanel an anonymous jury and took adequate measures to ensure that Mr. Tocco's constitutional rights were protected.

## B. *Clarence Crockett*

On appeal Mr. Crockett submits that the district court abused its discretion by denying his motion for severance. He also challenges his conviction on Count One (RICO conspiracy), contending that there was insufficient evidence to establish that he knew of, and agreed to join, the conspiracy.

### 1. Severance of parties

██ Mr. Crockett argues that the trial court should have severed his trial from Mr. Tocco's trial on the grounds that the "massive, overwhelming evidence of the violence on the part of Tocco" prejudiced his own right to a fair trial. Appellant Crockett's Br. at 12. Federal Rule of Criminal Procedure 14 provides that "[if] it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants ... the court may ... grant a severance of defendants...." "Whether to grant a severance motion is within the district court's discretion," *United States v. Pace*, 898 F.2d 1218, 1245 (7th Cir.1990), *cert. denied sub nom. Cialoni v. United States*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), and a district court's ruling on a severance motion "will be overturned only upon a showing of abuse of discretion." *United States v. Emond*, 935 F.2d 1511, 1514 (7th Cir.1991); *accord United States*

*v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). " '[T]o appeal successfully a motion for severance, a defendant must demonstrate actual prejudice resulting from the denial.' " *Emond*, 935 F.2d at 1514 (quoting *United States v. McAnderson*, 914 F.2d 934, 948 (7th Cir. 1990)). "The fact that a defendant might have had a better chance of acquittal in a separate trial is not enough to warrant severance under Rule 14." *Pace*, 898 F.2d at 1245.

During the joint trial, the district court repeatedly admonished the jury that certain evidence admitted only against Mr. Tocco was not to be considered against Mr. Crockett. Moreover, the instructions given to the jury emphasized that:

> [a]lthough the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so, you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.

Tr. Vol. 20 at 3528–29. In regard to the RICO conspiracy, the court instructed the jury that "[i]n determining whether the defendant you are considering became a member of the conspiracy, you may consider only the acts and statements of that particular defendant." *Id.* at 3534–35. In considering a similar challenge to a denial of severance, this court stated that "[i]t is presumed that a jury will follow such instructions and sort the evidence as to each defendant."[11] *United States v. Cochran*, 955 F.2d 1116, 1121 (7th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (May 4, 1992) (No. 91–8136). In this case, the instructions were adequate to counter any potential "spillover effect" from the evidence against Mr. Crockett's co-defendant. *See id.; United States v.*

---

**11.** Indeed, the special verdict rendered by the jury as to the predicate acts alleged against Mr. Crockett in Count Two (substantive RICO) dem- onstrates the care with which the jury sifted through the facts and charges in this case. *See* R. 232.

*Briscoe,* 896 F.2d 1476, 1517–18 (7th Cir.), *cert. denied sub nom. Usman v. United States,* 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *United States v. Lee Stoller Enterprises,* 652 F.2d 1313, 1319 (7th Cir.) (en banc), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). In light of the jury instructions and in light of the specific evidence presented against Mr. Crockett in respect to various acts of extortion alleged in Count One, we cannot conclude that the denial of severance resulted in an unfair trial or was an abuse of discretion on the part of the district court.

### 2. Sufficiency of the evidence for Count One

 Mr. Crockett contends that there was insufficient evidence to establish that he agreed to participate in the RICO conspiracy charged in Count One. He contends that the evidence merely shows that he was a very minor employee of Mr. Tocco.[12] As noted above, an appellant seeking to overturn a jury's verdict on the ground of sufficiency of the evidence shoulders a "heavy burden." *United States v. Hernandez,* 948 F.2d 316, 321 (7th Cir.1991). " 'The test is whether, after viewing the evidence in the light most favorable to the government *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979))). "A conspiracy to violate RICO requires a showing that defendant 'was aware of the essential nature and scope of the enterprise and intended to participate in it.' " *United States v. Campione,* 942 F.2d 429, 438 (7th Cir.1991) (quoting *United States v. Muskovsky,* 863 F.2d 1319, 1324 (7th Cir.1988), *cert. denied sub nom. Posner v. United States,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989)). Direct evidence need not be shown; " 'an agreement can be in-

ferred from the circumstances.' " *Id.* (quoting *Neapolitan,* 791 F.2d at 501). "[W]hen the evidence establishes that the defendants committed during a time period 'several acts of racketeering in furtherance of the affairs of the enterprise, an inference of an agreement to do so may be drawn.' " *United States v. Melton,* 689 F.2d 679, 683 (7th Cir.1982).

The evidence, viewed in the light most favorable to the government, was sufficient to permit a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. The evidence showed that Mr. Crockett collected street tax over a long period and from many of the victims identified in the indictment. Street tax collection was the primary activity of the RICO enterprise described in Count One and Count Two. The evidence also showed that Mr. Crockett worked together with other persons named in the indictment as associated with the RICO enterprise, and with some of Mr. Tocco's other street tax collectors. Not infrequently, he relayed instructions or messages from Mr. Tocco to the other street tax collectors. The evidence was sufficient for a reasonable jury to find that Mr. Crockett was aware of the essential nature and scope of the enterprise and intended to participate in it.

### Conclusion

For the foregoing reasons, the judgments of conviction against Albert Tocco and Clarence Crockett are affirmed.

AFFIRMED.

---

12. Mr. Crockett also contends that, under *Copperweld Corporation v. Independence Tube Corporation,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), an employee cannot be considered to conspire with his employer. This contention is without merit. *See Ashland Oil,* *Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir. 1989); *Haroco v. American Nat'l Bank and Trust Co. of Chicago,* 747 F.2d 384, 403 n. 22 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam).