**UNITED STATES of America, Appellee,**

v.

**Robert GARCIA and Jane Lee Garcia, Defendants–Appellants.**

**Nos. 1404, 1405, Dockets 90–1088, 90–1089.**

United States Court of Appeals, Second Circuit.

Argued June 15, 1990.

Decided June 29, 1990.

Robert G. Morvillo, New York City (Morvillo, Abramowitz & Grand, P.C., Fischetti, Pomerantz & Russo, Sarah N. Chapman, of counsel), for defendants-appellants.

Michele Hirshman, New York City, Asst. U.S. Atty., for the Southern District of

New York (Roger S. Hayes, Acting U.S. Atty. for the Southern District of New York, Helen Gredd, Asst. U.S. Atty., Donna R. Merris, Sp. Asst. U.S. Atty., of counsel), for appellee.

Before MESKILL, PIERCE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendants Robert and Jane Garcia appeal from judgments of conviction on two counts of extortion (18 U.S.C. § 1951) and one count of conspiracy to commit extortion (18 U.S.C. § 371) entered against them in the United States District Court for the Southern District of New York, Leonard B. Sand, Judge. For the reasons that follow, we reverse the Garcias' convictions and remand to the district court for further proceedings.

## BACKGROUND

Robert and Jane Garcia were charged with conspiracy, extortion, bribery, and receiving gratuities in connection with Robert Garcia's congressional activities on behalf of the now infamous Wedtech Corporation. The extortion and conspiracy charges were premised on two theories: (1) extortion by wrongful use of fear and (2) extortion under color of official right. At the close of the government's case, the Garcias moved for dismissal of the first theory. The district judge denied this request, concluding —erroneously, as we establish below—that the government had adequately demonstrated that the Garcias intended to exploit Wedtech's fear of economic loss.

The Garcias were acquitted by the jury of the bribery and gratuity charges, but were convicted of the substantive and conspiracy charges of extortion. Following the jury's verdicts, the Garcias moved for a new trial, claiming that the jury's acquittal of them on the bribery and gratuity counts suggested that the guilty verdicts on the extortion counts were based not on the second theory—under color of official right—but instead on the first theory of extortion—wrongful use of fear—and that the evidence could not support that conclu-

sion. Neither the government nor the Garcias had requested that special interrogatories be given to the jury in order to learn the actual basis for their decision. The district judge denied the new trial motion, and the Garcias appeal their convictions.

■ Since the jury was not given special interrogatories we cannot determine on this record the precise basis for the guilty verdicts. Therefore, for our purposes, we must assume the jury could have found the Garcias guilty of extortion under either theory presented by the government. Consequently, if there was insufficient evidence for one of the theories, then the verdict is ambiguous and a new trial must be granted. *United States v. Natelli*, 527 F.2d 311, 325 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *see also United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). By their Rule 29 motion to withhold from the jury the theory of extortion by fear of economic loss, the Garcias preserved their right to argue here that if the evidence was insufficient to support their extortion convictions on that theory, we should reverse and order a new trial on the remaining theory—extortion under color of official right. We turn, then, to the sufficiency of the evidence to prove extortion by fear of economic loss.

■ Extortion is defined in the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Over the years, our cases have concluded that the fear required in extortion cases "can be satisfied by putting the victim in fear of economic loss." *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir.1976) (citations omitted), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *United States v. Margiotta*, 688 F.2d 108, 134 (2d Cir. 1982) (citations omitted) ("[P]utting the victim in fear of economic loss can satisfy the element of fear required by the Hobbs Act."), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

In *United States v. Capo*, 817 F.2d 947 (2d Cir.1987), our court, sitting in banc, focused specifically on what factors are necessary to establish fear of economic loss. The present appeal requires us to apply the standards that we developed in *Capo* to a factual setting involving an elected official who sold his influence and power. *Capo* involved a job-selling scheme that took place at a plant of the Eastman Kodak Company. In 1982 Kodak announced that production of its new "disc camera" created the need for approximately 2,300 new employees. In the rush to fill these jobs, standard hiring procedures were ignored. Exploiting this situation, the defendants used their influence with an employment counselor at Kodak to see that individuals who paid them were hired as Kodak employees. This job-selling network formed the basis of an indictment for extortion based on a fear of economic loss, and the jury convicted.

On appeal, a panel of this court affirmed, *see United States v. Capo*, 791 F.2d 1054 (2d Cir.1986), but after an in banc rehearing we reversed, holding that a fear of economic loss must be viewed from the victim's perspective and that the victim must have reasonably believed "first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *Capo*, 817 F.2d at 951. Concluding that the Kodak job-selling scheme was not extortion, we emphasized that the "victims" had paid the defendants in an attempt to obtain influence. *Id.*, at 954. The "victims" in *Capo* thus did not act out of fear of the defendants or of what the defendants might do to them; rather, they were willing participants who were seeking to secure the defendants' assistance in order to improve their chances of obtaining a job. *Id.*, at 952.

The Garcias claim that their situation is similar to the one in *Capo*. They argue, in effect, that the payments that they received, like the payments in *Capo*, were not made out of fear but as a way of obtaining influence. For this reason, they claim, there was insufficient evidence to convict them of extortion based on a fear of economic loss. While a defendant challenging the sufficiency of the evidence "bears a 'very heavy burden'", *United States v. Chang An–Lo*, 851 F.2d 547, 553 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988) (citations omitted), we nevertheless agree with the Garcias and conclude that the evidence in this case was insufficient to support an extortion conviction based on a fear of economic loss.

## DISCUSSION

At trial the government relied on two claimed extortionate events: (1) a dinner meeting at a Manhattan restaurant and (2) a $20,000 loan by Wedtech to the Garcias.

### A. The Alleged Dinner Extortion.

[3] In 1978 Robert Garcia was elected to the United States Congress as a representative of the South Bronx, where the Wedtech Corporation was located. During his first years in office, Garcia extended normal congressional assistance to Wedtech in connection with a $550,000 loan from the Small Business Administration, $4 million in loans from the Economic Development Administration, and a bid for an army contract.

In April of 1984, Wedtech received a $24 million dollar contract to build pontoons for the navy. A few weeks after Garcia, along with other congressional figures, had attended a press conference announcing the award of this contract, Garcia called Mario Moreno, a Wedtech officer, and told him that it was important that the two of them meet. They agreed to have dinner the next evening at a midtown Manhattan restaurant.

Garcia and his wife, Jane, met Moreno. The congressman complained that Moreno had not kept him properly informed about Wedtech's activities. Moreno first described Wedtech's success and rapid growth in recent months. Then, when Moreno told the Garcias that Wedtech was having difficulties with the navy pontoon contract, Jane Garcia interjected that she and her husband were friendly with a classmate of then Secretary of the Navy John

Lehman and that they could arrange a meeting with Lehman to resolve some of the problems with the contract. Robert Garcia boasted of his increasing influence in congress, and then proposed that Wedtech hire Jane Garcia as a public relations consultant.

Moreno told the Garcias that Wedtech, which was dealing primarily with government contracts, had no need for a public relations consultant and even if it did, it would be "crazy" to hire the wife of a congressman for the position. Garcia persisted, commenting that perhaps the payments to his wife could be made in another way. Jane Garcia then suggested that she be paid through an intermediary, Ralph Vallone, Jr., a lawyer in Puerto Rico who was a good friend of the Garcias.

As the dinner came to an end, the Garcias emphasized their influence with top officials at the navy and at the United States Postal Service. They did this knowing that Wedtech was attempting not only to resolve its problems with the navy pontoon contract, but also that the company was attempting to obtain postal contracts. At this point, Moreno told the Garcias that he personally supported their proposal and would seek approval for it from other Wedtech officials.

Fearing that a denial of payments to Jane Garcia would induce Garcia to withhold his support for the postal contracts Wedtech sought, the Wedtech officers approved the payments.

Wedtech began to send monthly checks to Vallone, who then deposited them and sent Jane Garcia's consulting company, Leesonia Enterprises, checks of comparable amounts. During the period that these payments were made, Jane Garcia received $76,000.

In support of its claim that Wedtech made these payments out of economic fear, the government points primarily to Robert Garcia's statement at the beginning of the dinner conversation. Moreno testified that Garcia had said:

> We have been apart for a long period of time. We don't communicate as much as we used to before, several years before,

two or three years before. We had to find out from somebody else that the company had gone public, and that other people had benefited from the company * * *. Can you explain to me what has happened there at the company in reality in the last year or so?

The government claims that Garcia made this statement knowing that Wedtech's economic life depended on continued political influence. This statement, it argues, was therefore an implicit threat: Garcia was warning Wedtech that unless he and his wife were paid, the company could no longer count on Garcia as a congressional advocate. This could in turn lead to a failure to obtain any more government contracts. But did Moreno perceive this statement as such a threat? There is no evidence that he did; on the contrary, the evidence shows that he did not.

During the dinner, the Garcias mentioned their contacts in the Postal Service, from which Wedtech was attempting to obtain a contract. Moreno stated that during the dinner he was thinking "that the Congressman [Garcia] could be a tremendous ally in * * * trying to get [the] contracts from the Postal Service."

When asked at trial why he approved the payment of money to Jane Garcia, Moreno answered:

> Because I felt that if we were not going to make those payments, the Congressman was not going to do the kind of activity that we would need to have done to convince Postmaster General Bolger to set aside those contracts for Wedtech.

Later, Moreno testified: "I felt that if we were not to satisfy those payments, we were not going to receive any activity beneficial to us regarding those postal contracts."

This is not the mindset of a victim of economic extortion; rather, it is the thinking of a shrewd, unethical businessman who senses and seeks to capitalize on a money-making opportunity.

The central fact is clear: even in the face of Garcia's disgraceful request for money, Wedtech was not risking the loss of any-

thing to which it was legally entitled. Wedtech would still be permitted to bid on government contracts. But without Garcia's favorable attitude, the company might not be able to count on continued preferential treatment, nor could it secure Garcia's favorable intervention in the future. Garcia, in turn, was in effect offering to sell his congressional power, but he was not using that power as a way to intimidate Wedtech. By paying the Garcias, Wedtech was purchasing an advocate, not buying off a thug.

On redirect examination of Moreno, the prosecutor crystallized the motivating reason behind Moreno's decision to make the payments:

Q. Now, sir, you were asked questions about—by both lawyers about the meeting at Lelo's [the Manhattan restaurant]. Did you consider it legal or illegal to agree to Congressman Garcia's request that you pay his wife through Vallone?

A. Illegal.

Q. Why did you consider it illegal?

A. Because we were the constituents in Congressman Garcia's district. And to my knowledge, he is not supposed to be receiving any payments for any services he may perform for the company with the government. And I always viewed him and his wife as one unit.

Q. When you made that agreement in Lelo's in May of 1984, did you agree to pay the money for services from Jane Garcia or Congressman Robert Garcia?

A. For Congressman Garcia's services.

In short, the dinner meeting did not generate in Moreno or Wedtech any fear of economic loss within the meaning of the federal extortion statute as we have interpreted it in *Capo*.

B. *The Alleged $20,000 Loan Extortion.*

■ The Garcias were also convicted of extorting a $20,000 loan from Wedtech. On August 2, 1985, Robert Garcia told Moreno it was urgent that they meet and discuss a matter that was too sensitive to discuss over the phone. Moreno agreed and met Garcia at his Bronx congressional office. When Moreno arrived, Garcia asked to borrow $20,000 immediately, since he was leaving shortly for the Middle East. Moreno, who was $12,000 overdrawn at the bank himself, told Garcia that this loan could probably be arranged, but that he would have to check with other Wedtech officials. After getting the necessary funds from Wedtech's "slush fund", Moreno returned the same day to Garcia's office where Garcia suggested that the check be made payable to his sister, the Reverend Aimee Cortese, who would in turn forward the money to the Garcias. Garcia then directed a congressional aide to prepare documentation showing a loan between Moreno and Cortese. In Garcia's office, Moreno gave a check for $20,000 to Cortese, who deposited it and wrote another check to Jane Garcia for the same amount. Moreno testified that he believed that if he did not lend Garcia the money, Garcia would no longer help Wedtech.

Although the loan was supposed to be repaid in October of 1985, the Garcias did not repay it until March of 1986. Before finally repaying the loan, Robert Garcia asked Moreno to donate the $20,000 to the Reverend Cortese's church. Moreno declined, telling Garcia that he needed the money himself but that perhaps he would make a donation to the church in the future.

Recognizing that it has presented no evidence to demonstrate that even an implicit threat accompanied Robert Garcia's request that Wedtech lend him $20,000, the government argues that the Garcias' original "threat" created a "climate of fear" that colored all their future dealings with the company. While Moreno testified that he had agreed to the loan because without it Garcia "would not continue to do things in the same way that [Moreno] felt he could do", this does not demonstrate the kind of fear that is required by our decision in *Capo*. Had Garcia actually established a climate of fear, as the government contends, Wedtech would not have refused Robert Garcia's request that Wedtech convert its loan into a "donation" to his sister's church. But this is precisely what

Wedtech did, and its refusal powerfully illustrates Wedtech's lack of fear.

The government does not have to prove that a climate of fear was created by a direct threat; nevertheless, the government must at least prove the existence of the victim's belief that the defendant had the power to harm it and the victim's fear that the defendant would exploit that power. *See Capo*, 817 F.2d at 951. However, there was no evidence that in making these payments Wedtech acted out of fear. At the time the alleged initial "threat" was made, Moreno viewed Garcia as an "ally." Moreover, the Garcias did not threaten Wedtech with harm, but instead underscored the mutual benefits that would flow from Wedtech's payments: the Garcias would obtain badly needed cash, and Wedtech would receive more government contracts than was likely without Garcia's help.

While the evidence readily proved that Wedtech paid the Garcias in the hope of receiving future favors, it did not establish that the company acted out of fear that without these payments it would lose existing contracts or even opportunities to which it was legally entitled. As in *Capo*, there was an "absence of any evidence of detrimental action for nonpayment * * *." *Capo*, 817 F.2d at 953. Garcia never even hinted that he was prepared to use his power to harm Wedtech.

Without expressing—however implicitly—such a threat, the Garcias did not create in Moreno or Wedtech any feeling of fear; there is no evidence of any other cause of fear; and without the victim feeling some fear, extortion through fear of economic loss cannot exist. Wedtech paid the Garcias to ensure that it would receive special, preferential treatment; in making the payments, the company was motivated by desire, not fear; by opportunity, not by concern with retribution. As we sought to make clear in *Capo*, that is not the stuff of which extortion is made.

## SUMMARY AND CONCLUSION

Because there were no special jury interrogatories, we have no way of knowing on which theory of extortion the Garcias were convicted. The district court, over objection, permitted the jury to consider the theory of economic loss, but we have concluded that the evidence presented was insufficient to support that conviction. Accordingly, we must reverse the judgments of conviction and remand to the district court for further proceedings.

We do not reach the alternative, evidentiary issue raised by the Garcias.

The mandate shall issue forthwith.

Reversed and remanded.