UNITED STATES of America, Plaintiff,

v.

Kirk ALBERTSON, Defendant.

Criminal Action No. 97–4 MMS.

United States District Court,
D.   Delaware.

Argued June 25, 1997.

Decided July 22, 1997.

Richard G. Andrews, Assistant United States Attorney, Department of Justice, Wilmington, Delaware, for plaintiff.

Gary F. Traynor, of Prickett, Jones, Elliott, Kristol & Schnee, Dover, Delaware, for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I.  INTRODUCTION

Kirk Albertson ("Albertson") was charged in a single-count indictment with attempted extortion in violation of the Hobbs Act, 18

U.S.C. § 1951. A jury returned a verdict of guilty after a four-day trial, during which Albertson made several timely motions for judgment of acquittal. Pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, the Court reserved decision on Albertson's motions for judgment of acquittal. Albertson has since filed a motion seeking, in the alternative, a new trial based upon an allegedly erroneous jury instruction.

The core issue presented here is a narrow one: whether one who organizes and leads legitimate legal and political opposition that impedes a developer's efforts to utilize land commits a Hobbs Act violation when he requests $20,000 in return for dropping his opposition. Stated differently with regard to the facts adduced at trial and related below, the question is whether Albertson's unsolicited offer to drop his opposition to a proposed land development known as Applewood Farms in exchange for a $20,000 sponsorship for the Dover Destroyers, his semi-pro football team, constituted the "wrongful" use of economic fear within the ambit of the Hobbs Act.

This precise legal issue is one of first impression within the Third Circuit. Indeed, the Court has searched in vain for an interpretation of the Hobbs Act by a federal court confronted with facts similar to these. For the reasons that follow, the Court holds Albertson's conduct does not constitute a violation of the Hobbs Act. Albertson's motion for judgment of acquittal will be granted, rendering moot his motion for a new trial.

## II. FACTUAL BACKGROUND

This tale began innocently enough with an attempt by Joseph Corrado and his business partners to develop approximately eighty acres of land in Camden, Delaware. Corrado wanted to construct a manufactured home community to be rustically dubbed "Applewood Farms." To that end, Corrado applied to the Camden Town Council in October of 1995 for conditional use approvals and to rezone the eighty acres from partly industrial and partly preservation to residential. Government Exhibit ("GX") 7. According to his

administrative assistant, Corrado sank nearly $650,000 into the property all told, including the purchase price.[1]

In a December 5, 1995 public hearing, the Camden Town Council approved the rezoning and conditional use over the vocal opposition of many Camden residents and Albertson, a resident of nearby Wyoming, Delaware. Despite the approval, opposition to the Applewood Farms project continued, mainly through the efforts of a newly formed group called the "Concerned Citizens of Camden" ("CCC"). While Albertson was not an officer of CCC, he spearheaded their resistance to the Applewood Farms project.

The labors of CCC, and particularly Albertson, proved not to be in vain. For example, in February 1996 Camden Town Council elections, two antidevelopment candidates—recruited and aided by CCC and Albertson—supplanted the mayor and a councilman, both of whom had supported Corrado's application. In addition, Albertson and the wife of the newly elected antidevelopment mayor petitioned the Delaware Attorney General's Office ("DAG") to invalidate the rezoning of Corrado's eighty acres. GX–11A. In June, the DAG issued an opinion letter agreeing the rezoning was invalid and ordering a new public hearing. GX–12A. After a request for reconsideration by Corrado, the DAG retreated somewhat; the DAG retracted its order for a new hearing and concluded it was up to the Town Council to decide whether it would have another public hearing to debate the rezoning of the eighty acres.

Throughout this period, moreover, both Corrado and antidevelopment forces engaged in a vitriolic campaign to sway local public opinion in favor of their respective viewpoints. Both sides distributed flyers accusing the other of distorting the truth, and Albertson wrote several opinion pieces in the Delaware State News, a local newspaper, attacking the Applewood Farms project. The pitched public-relations battle spilled into the courtroom when Corrado filed suit on August 8, 1996 in Delaware Chancery Court against the Town of Camden, the may-

---

1. Neither side has ordered a trial transcript; accordingly, some of the narrative has been pieced together from handwritten notes, trial exhibits, and transcripts from tape-recorded exhibits.

or's wife, and Albertson. Corrado sought an injunction against another public hearing, a declaration the rezoning was lawful, and attorney's fees. GX–13.

This was essentially how matters stood until October 30, 1996, when Albertson telephoned Corrado at work with a surprising proposition: sponsor Albertson's newly acquired semi-pro football team, the Dover Destroyers, in the form of a $20,000 donation, and Albertson would drop his opposition to the Applewood Farms development. At trial, Corrado related the conversation as follows:

PROSECUTOR: How did the conversation go?

CORRADO: Well, I picked up the phone and said, Hello. And Mr. Albertson said, Do you know who this is?

And I said, Yes, I do.

He said to me—he said, I have a proposition for you.

And I said, Oh, what was that, or what is that?

And he said, I'd like you to consider that for removing opposition to your project, would you contribute $20,000 to my football team?

And I guess I was silent for several seconds and I said to him, Well, I can't give you an answer now. I'll have to talk to my partners and I'll have to get back to you.

And that was pretty much the sum and substance of the conversation.

Excerpted Transcript ("ET") at 179, lines ("11." 4–19). As he walked out of his office following his conversation with Albertson, a shocked Corrado told his administrative assistant "I think I've just been bribed." ET at 180, l. 9.

Corrado's next move was to hire Lewis W. Hyden III, a recently retired Federal Bureau of Investigations ("FBI") Agent for ad-

vice on how to handle Albertson's "proposition."[2] Under Hyden's tutelage, Corrado initiated and recorded a telephone conversation with Albertson on November 20, 1996. During that conversation, Albertson informed Corrado he was "serious about the cause," but had "another thing that has risen up [i.e., his football team]." Albertson told Corrado he was "pretty excited" about the semi-pro football team, and advised Corrado a $20,000 donation would "show possibly good intentions on your side in the community." Curious about what he would receive in return, Corrado prodded Albertson further by stating, "Um, you know, you said you could fix things and take away all the opposition."

"I remove myself from the puzzle," Albertson responded. He elaborated by analogizing, "[I]f you cut the head off the dragon, the dragon can't operate." Transcript of GX–1 at 2.[3]

When Corrado asked if Albertson could "make the Mayor go away or what[,]" Albertson laughed and said "you've got that to do yet.... [T]he Mayor is your neighbor." In fact, Albertson confirmed he could not state he had any "influence" with the Mayor. Later in the conversation, Albertson emphasized he "can't control the whole situation, ... but you'll have removed a large portion of your splinter." When further pressed by Corrado whether he would "go away" for $20,000, Albertson replied, "For a twenty thousand dollar sponsorship, I would be more than grateful that you've helped my team out." The two men then planned to meet at a local restaurant. Transcript of GX–1 at 24. Before Corrado left to meet Albertson, Hyden contacted his former colleagues at the Wilmington FBI.

The remainder of the Government's case was principally composed of four ensuing conversations between Albertson and Corra-

---

**2.** In fact, trial testimony revealed Hyden had served as a superior in the FBI to Agent Dominic Desderio, who was in charge of the FBI investigation of Albertson.

**3.** As is the case with the other tape-recorded Government Exhibits, the transcript itself is not in evidence, only the recordings are. With no

trial transcript and no opposition to the transcripts which were given to the jury as an aid in understanding the tapes, *see Government of the Virgin Islands v. Martinez*, 847 F.2d 125, 128 (3d Cir.1988), the Court as a matter of convenience has used the transcripts in this opinion.

do. At the restaurant on November 20th, Albertson explained his position to Corrado:

> I controlled all the meetings. I put all the people in, in, I didn't personally put them in, the people voted them in, but I gave the people something to vote for.... I've got 800 more fliers sitting out there ready to go to town. Cause you've got these elections coming up, you've got four people on the council that are opposed to you, your chances start getting slimmer all the way down the line. You know, like I said, I don't think it's good idea. You've got your own reasons. You'll make some money from it, I mean that's your reasons for coming into Camden and doing something there. You've got land, you've got two pieces of land, you know those are all your reasons. I'm truly 100% against it. But, if you do what you're going to do and sponsor my football team, I'll not stand in your way anymore, and I will show you after your check clears the bank or whatever, how to let me walk out of this whole thing where neither one of us are put up on a pedestal that makes both of us look bad.

Transcript of GX-2 at 2. While he conceded his absence from the opposition would not guarantee the success of Applewood Farms, Albertson suggested he could subtly influence the mayor to drop opposition to the project. Transcript of GX-2 at 6, 7. Finally, Corrado and Albertson had the following two exchanges:

> CORRADO: So, I imagine if, if uh, we don't make the contribution then we're looking at some more opposition.
>
> ALBERTSON: I wouldn't say uh, I'd be most grateful as a sponsorship, I would be very grateful as a sponsorship.
>
> CORRADO: And if we didn't?
>
> ALBERTSON: (Laughs)
>
> CORRADO: Then we got the opposition. Right?
>
> ALBERTSON: Well, you're a smart businessman. You know, you know, what is out there.

Transcript of GX-2 at 8. Later:

> CORRADO: You're not going away. I mean if I don't make this contribution,

you're not going away. That's what you're telling me.

> ALBERTSON: We wouldn't be sitting here, I don't think.
>
> CORRADO: Okay.
>
> ALBERTSON: If, you know. Know what I'm saying? We wouldn't be sitting here, I don't think if, if there wasn't anything else there.

Transcript of GX-2 at 9.

Corrado called Albertson on December 5, 1996, and the two met again at a local diner. Once more, Albertson detailed what Corrado would be getting for a $20,000 sponsorship of the Dover Destroyers. Again, Albertson emphasized Corrado was primarily purchasing Albertson's inaction; that is, Corrado would not "see flyers on the street, paper interviews or anything like that." Transcript of GX-4 at 2. During the meeting, Albertson told Corrado he would contact his attorney in the Chancery Court action and inform him he would no longer oppose the Applewood Farms project. Corrado gave Albertson a check for $5,000, offering to pay the balance after Albertson showed him "something positive." *Id.* Albertson signed a stipulation of dismissal from the lawsuit in Chancery Court on December 18, 1996.

On December 23, Albertson went one last time to a local diner to meet Corrado, who was to pay Albertson the remaining $15,000. At the diner, Albertson met the FBI, who arrested him for the attempted extortion of Joseph Corrado. After presentation of this evidence and more at trial, the Court instructed the jury as to the elements necessary to sustain a conviction under the Hobbs Act. Albertson made a timely objection to the charge, the jury returned with a guilty verdict and defendant's motion for Judgment of Acquittal followed.

## III. DISCUSSION

### A. Motion for Judgment of Acquittal— Standards

When considering a motion for judgment of acquittal, the Court must view the evidence in a light most favorable to the Government and determine whether there is suf-

ficient evidence upon which a reasonable jury could have based its verdict. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Obialo*, 23 F.3d 69, 71–72 (3d Cir.1994) (citing *United States v. Pungitore*, 910 F.2d 1084, 1128–29 (3d Cir.1990)). Further, "[t]he evidence need not unequivocally point to the defendant's guilt so long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *Pungitore*, 910 F.2d at 1129 (citing *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir.1989)).

### B. The Hobbs Act

■ The Hobbs Act prohibits extortion, which is defined as "the obtaining of property from another with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added).[4] The Hobbs Act thus proscribes two types of extortion: (1) extortion by wrongful use of force, violence, or fear; and (2) extortion under color of official right.[5] Since Albertson lays no claim to public office, the Government did not prosecute him under a "color of official right" theory of attempted extortion. Instead, the Government prosecuted Albertson for allegedly committing.the first type of attempted extortion—specifically, the attempted extortion of money through the wrongful use of fear.

■ Drafting the Hobbs Act, Congress principally had in mind outlawing gangland thuggery and its influence within labor unions. *See United States v. Mazzei*, 521 F.2d 639, 652 n. 16 (3d Cir.1975) (en banc).[6] The Hobbs Act is broadly worded, however—it criminalizes the "wrongful" use of fear—and courts have since applied it to conduct other than the classic threat to do violence unless the victim parts with his pocketbook. *See United States v. Sturm*, 870 F.2d 769 (1st Cir.1989) (Hobbs Act prosecution based upon creditor's fear of nonpayment). Indeed, it is now well-settled that "fear," as used in the Hobbs Act, encompasses fear of economic loss as well as fear of physical harm. *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir.1972).

■ The Government and Albertson are in general agreement to the facts and general principles of law as elicited at trial and recited above. For example, Albertson does not deny he offered, among other things, to drop his opposition to the Applewood Farms project and exert Machiavellian influence over Camden Town Council members to do the same in exchange for a $20,000 donation to his football team.[7] *See* Transcript of GX–2 at 6, 7. Indeed, Albertson could not plausibly deny this occurred; much of the evidence used against him at trial were tape-recorded conversations he had with Corrado.

### C. The Jury Instruction

■ Instead, the dispute between the parties can be characterized as a result of two

---

**4.** The Hobbs Act, 18 U.S.C. § 1951, provides:

   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or by extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

   (b) As used in this section—

   b3      *      *      *      *      *

   (2) The term "extortion" means the obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

**5.** The Hobbs Act proscribes not only extortion, but also attempts to commit extortion. *United States v. Rosa*, 560 F.2d 149, 153 (3d Cir.1977).

**6.** In *Mazzei*, Judge Gibbons of the Third Circuit Court of Appeals traced the evolution of extortion proscriptions in federal law, from the Anti–Racketeering Act of 1934 which was aimed at "typical racketeering activities" such as "price fixing and economic extortion directed by professional gangsters," 521 F.2d at 652–53 n. 16 (Gibbons, J., dissenting) (quoting Letter of Attorney General, H.R.Rep. No. 1833, 73rd Cong., 2d Sess. 2 (1934)), to the Hobbs Act, which based its definition of coercive extortion on the Anti–Racketeering Act of 1934. *See id.* at 651–53.

**7.** The fact the $20,000 was diverted to Albertson's football team rather than his personal account is irrelevant, as "[i]t is well-established that a person may violate the Hobbs Act without himself receiving the benefit of his coercive actions." *United States v. Cerilli*, 603 F.2d 415, 420 (3d Cir.1979).

different views of the Hobbs Act. The Government views the law under the Hobbs Act as simple and well-settled: if the defendant has no lawful claim to the property involved, he is guilty under the Hobbs Act. Albertson, on the other hand, advocates a different perspective: if the payor receives something of value in exchange for his property, there can be no Hobbs Act violation.

This dispute can be narrowed even further. Here and at trial, Albertson and the Government diverged on the proper definition of one key element of a Hobbs Act violation—that a defendant's use of economic fear must be wrongful. The Government's proposed instruction was brief, and as follows: "The term wrongfully in this regard means that the defendant had no lawful claim or right to the money or property he sought or attempted to obtain." D.I. 20 at 14.

Albertson proposed a far different instruction:

The use of fear, in and of itself, is not "wrongful" within the meaning of the statute. If Joseph Corrado or the business entities with which he was associated, in exchange for money paid to the defendant, were to receive something of substantial value which they otherwise were not entitled to receive, the defendant would not be acting in a "wrongful" manner. If you find that the Government has not proved beyond a reasonable doubt that the defendant acted "wrongfully" as I have just defined that term for you, you must find the defendant not guilty.

D.I. 23. The Court, not satisfied with either of these instructions, invited legal argument regarding a replacement charge. After extended debate and thorough deliberation, the Court crafted its own instruction, which was read and given to the jury. This instruction provided:

The Government must prove beyond a reasonable doubt that the defendant attempted to obtain the money or property of another by the "wrongful" use of actual or threatened fear of economic loss.

The use of fear of economic loss is not always "wrongful." For our purposes, the use of fear of economic loss is wrongful if the defendant had no claim of right to the property he attempted to obtain, and the defendant attempted to obtain the property by exploiting Mr. Corrado's fear of economic loss.

Please keep in mind, however, that the defendant did not act wrongfully merely by requesting and receiving money in exchange for settling litigation and/or merely by seeking contribution or sponsorship for his football team, despite the fact that he did not have a claim of right to that contribution or sponsorship. Also, keep in mind Mr. Corrado had no right to be free from opposition to its development project. Therefore, the defendant also did not act wrongfully by actively opposing Mr. Corrado's project—all of us have the right to participate in the political process and oppose real estate projects of developers. *The defendant only acted wrongfully if, for the purpose of exploiting Mr. Corrado's fear of economic loss, he threatened to continue opposition to Mr. Corrado's project so that the defendant might gain sponsorship and/or contribution for his football team.*

D.I. 25 (emphasis added). By returning a verdict of guilty, then, the jury found Albertson exploited Corrado's fear of economic loss by threatening to continue his opposition to Applewood Farms,[8] a position he truly believed in, but sacrificed on the mantle of greed. The remainder of this opinion is premised on that finding.

### D. Wrongful Use of Fear

■ The debate over the propriety of the jury instructions is a reflection of a wrinkle in Hobbs Act jurisprudence: not all economic threats are outlawed by federal law and the Hobbs Act intercedes in private dealings only when economic threats are used for a wrongful purpose. *See United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir.1981). The Hobbs Act does not define "wrongful"; in-

---

8. As detailed above in the factual background section of this opinion, there was ample evidence to support this finding.

stead, courts have been left to determine on a case-by-case basis whether the Hobbs Act extends to the conduct at issue. As will be demonstrated, the line separating the legitimate economic threat from the wrongful (and hence extortionate) demand can be a fine one indeed. At one end of the Hobbs Act spectrum there is what the First Circuit Court of Appeals has described as the "straightforward example of a lawful economic threat": when one party threatens litigation in an effort to persuade another party to honor a contract which the first party believes has been breached. *United States v. Kattar*, 840 F.2d 118, 123 (1st Cir.1988). At the other end there is the instance when one party threatens to retain and use property that belongs to another party unless the first party receives payment. *See United States v. Inigo*, 925 F.2d 641, 649–50 (3d Cir.1991). But other threats, such as the ones made by Albertson, fall somewhere between those two extremes. Thus, at bottom, the question to which the parties' efforts are addressed is whether the Hobbs Act criminalizes Albertson's conduct.

◼ As noted earlier, the Government proposed a jury instruction that described any attempt to obtain money to which one has no lawful claim by a threat of economic injury as "wrongful" under the Hobbs Act. This definition is legally correct, at least in the union violence context, *see United States v. Enmons*, 410 U.S. 396, 400, 93 S.Ct. 1007, 1009–10, 35 L.Ed.2d 379 (1973); DEVITT, BLACKMAR & O'MALLEY, FEDERAL JURY PRACTICE AND INSTRUCTIONS, CRIMINAL, § 45.08 (4th ed.1990),[9] and accordingly, the Government views this case as a simple one: Albertson had no lawful claim to a $20,000 sponsorship and therefore must be found guilty of extortion. This argument assumes a broad reading of the Hobbs Act, however—that Albertson had no "lawful claim" to the $20,00

sponsorship and that the Hobbs Act should be interpreted to encompass the type of conduct admittedly engaged in by Albertson.

Pointing to cases elucidating the difference between "hard-bargaining" and extortion, Albertson attacks this assumption and the Government's view regarding the breadth of the Hobbs Act. In *Viacom Int'l, Inc. v. Icahn*, a "greenmail"[10] case, the Southern District of New York described the difference between "hard bargaining" and extortion as follows:

> In a "hard bargaining" scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant. If a victim is entitled by law to be free from the fear he is quelling by giving property to the defendant, then the "something of value" the victim receives is, as a matter of law, as "imposed, unwanted, superfluous and fictitious" as the hiring of a second worker to do the job that another worker is already doing.

747 F.Supp. 205, 213 (S.D.N.Y.1990) (emphasis added) (internal citations and quotations omitted), *aff'd*, 946 F.2d 998 (2d Cir.1991). *See also Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 232 (S.D.N.Y.1992) ("Where the victim of the alleged extortion relinquishes property to the defendant out of fear of economic loss but receives in exchange something which is of no value to the victim, the defendant has no lawful claim to the property received."), *aff'd mem.*, 99 F.3d 401 (2d Cir.1995). Seizing upon this language, Albertson sees a judicially-crafted limitation on the broad language of

---

9. In the commentary to this proposed jury instruction, the editors blithely note: "The use of the word 'wrongful' in the definition of extortion in the Hobbs Act has generated some controversy." DEVITT, BLACKMAR, AND O'MALLEY, FEDERAL JURY PRACTICE & INSTRUCTIONS, CRIMINAL, § 45.08 notes (4th ed.1990).

10. Greenmail is defined as causing a "target company to buy the shares already obtained by

the hostile would-be acquirer at a substantial premium over the latter's cost, with the understanding that he, she, or it will stop the takeover attempt." ROBERT C. CLARK, CORPORATE LAW 574 (1986). *See also* Tracy Greer, Note, *The Hobbs Act and RICO: A Remedy for Greenmail?*, 66 TEX. L. REV 647, 649–51 (1988) (examining greenmail phenomenon).

the Hobbs Act. Thus, argues Albertson, if the victim receives something *of value*—in other words, something to which he is not already legally entitled and hence not "imposed, unwanted, superfluous and fictitious"—then a transaction cannot be extortionate. Analogizing to this case, Albertson notes it is undisputed that in exchange for $20,000, Corrado received a covenant from Albertson that he would *not continue* his political and legal opposition to Applewood Farms—this covenant was of considerable value to Corrado and was far from "imposed, unwanted, superfluous, and fictitious." Since Corrado, as a land developer, had no right to pursue his business interests in Camden without political opposition, Albertson concludes he cannot be found guilty of extortion as a matter of law.

The Government responds to the distinction in *Viacom* by arguing two related points. First, the Government asserts the *Viacom* court, in excusing "hard-bargaining" from the prohibitions of the Hobbs Act, drew a distinction that runs counter to precedent from the Third Circuit Court of Appeals, as well as from the First and Seventh Circuit Courts of Appeal. Under these authorities, argues the Government, the proper perspective in defining "wrongful" is focussed not on what the victim is receiving or giving up, but on what the alleged extortionist has obtained in return and whether he has a claim of right to that property. Accordingly, the Government presses, because Albertson had no legal right to charge Corrado for ceasing his otherwise lawful activities, Albertson's attempt to obtain $20,000 was extortionate; it is irrel-evant that Corrado might have received something of value in return.

The Government's second argument is Albertson committed attempted extortion because, unlike that of the corporate raider in *Viacom*, Albertson's conduct was secretive, not overt, and aimed at personal enrichment, not for the public benefit. Because of these distinctions, the Government urges, Albertson's conduct is forbidden under the Hobbs Act. The Court will address each of these arguments in turn.

1. *The Government's first argument: The "hard bargaining"/extortion distinction drawn in* Viacom *is incorrect.*

The Government relies upon *United States v. Cerilli*, 603 F.2d 415 (3d Cir.1979), as binding precedent that settles any question regarding Albertson's guilt. Were *Cerilli* to obviate the distinction drawn in *Viacom*, this would be so. But *Cerilli* does not stretch the Hobbs Act as far as the Government would take it; in fact, *Cerilli* can be reconciled with Albertson's argument, based on *Viacom*, that to the extent he threatened Corrado with economic loss, he did not do so wrongfully within the meaning of the Hobbs Act.[11]

In *Cerilli*, public officials conditioned an award of public contracts upon the payment of a political contribution; as the Third Circuit Court of Appeals described it, the case involved "the relationship, on a local level, between the financing of political parties and the choice of individuals for certain not-so-high ranking but sometimes lucrative work." *Id.* at 417. The defendants in *Cerilli* made an argument similar to that made by Albertson here: they argued they were insulated

---

11. The Third Circuit Court of Appeals has not addressed the "hard-bargaining"/extortion distinction, but in *United States v. Addonizio*, 451 F.2d 49 (3d Cir.1972), the appellate court traced the roots of the definition of extortion under the Hobbs Act, adopted from New York law. The New York Penal Law, which defined extortion at the time of enactment of the Hobbs Act, distinguished extortion from bribery. Interpreting New York case law, the *Addonizio* court reasoned "while bribery was a voluntary payment made in order to exert undue influence upon the performance of an official duty, extortion involves payment in return for something *to which the payor is already legally entitled*." *Id.* at 72. "In other words," wrote the *Addonizio* court, "while the essence of bribery is voluntariness, the essence of extortion is duress." *Id.* (citing *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960)). *See also United States v. Inigo*, 925 F.2d 641, 650 n. 8 (3d Cir.1991) ("[I]t is sometimes necessary to distinguish extortion from bribery under the Hobbs Act, ... Under the New York cases, bribery was a voluntary payment in order to influence an official duty, but extortion was a payment under duress in order to protect some interest for which the payer already had legal protection."). As the statement in *Addonizio* came in the context of an historical discussion, it is unclear whether the Third Circuit would adopt a blanket limitation that for an extortion conviction to stand, the payor must give up something to which he is legally entitled.

from Hobbs Act liability because their "allegedly criminal conduct was inextricably linked to protected political activity...." *Id.* at 421. The *Cerilli* court rejected this defense and to the Government, then, Albertson's threat of continuing his otherwise legal opposition to the Applewood Farms project was an inept attempt at extortion.

But *Cerilli* does not dictate Albertson's fate for several reasons. While it addressed extortion by the wrongful use of fear, *Cerilli* centered on the actions of public officials and also addressed extortion under color of official right. Albertson, of course, is not a public official, nor did he purport to act under color of official right; thus, one of the twin goals of the Hobbs Act served in *Cerilli*—meeting out justice to corrupt public officials—is not implicated in this case.[12] Further, and most important, unlike the officials in *Cerilli* who had the sole power to award contracts, Albertson was in no position to remove *all* opposition to Applewood Farms. Nor was he able to grant Corrado the necessary permits to complete the Applewood Farms project. As Albertson acknowledged, the most he could do was remove his personal (albeit considerable) opposition and perhaps render advice and influence on how to obtain ultimate approval for the project. In short, *Cerilli* is different in that it represents a clear instance of "pay to play." The public officials in *Cerilli* required payments in exchange for an opportunity to compete for a state contract. In contrast, even had Corrado decided not to provide a sponsorship, he would not lose his opportunity to compete—to wit, he could still operate through legal and political means to obtain clearance for Applewood Farms.

A recent decision from the Sixth Circuit Court of Appeals, *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996), is instructive in clarifying this distinction. In *Collins*, the husband of the Kentucky Governor solicited contributions for the Governor's political party in exchange for the right to contend for state contracts. *Id.* at 1026. In upholding the Hobbs Act conviction of the spouse, the Sixth Circuit Court of Appeals reasoned "the evidence in this case was sufficient to establish that [the payors] acted out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled." *Id.* at 1030. The *Collins* court elaborated:

> [The payors] all faced the threat that if they did not contribute to the party ..., they would not be considered for state contracts. They would not be able to get in the door. They received the clear message that in order to compete for bond business in Kentucky, they would have to pay the gate keeper, [the defendant].

*Id.*

While couched in slightly different terms, both *Viacom* and *Collins* are striking at the same principle: a payor must be deprived of a "level playing field" to be the victim of a Hobbs Act violation. In other words, if the payor is paying the defendant for the opportunity to compete like everybody else, then the payor is a "victim" under the Hobbs Act; while he has received something for his money, it was something to which he was otherwise entitled—a level playing field—and therefore what was received was "imposed, unwanted, or superfluous." On the other hand, if a payor willingly transfers property to the defendant in an effort to gain an advantage and will not suffer more than anybody else for not making the payment, then there is no Hobbs Act violation. What Albertson offered Corrado was the opportunity to make considerable headway on an already-level playing field, an opportunity from which Corrado was free to walk away with impunity.

Two decisions from the Second Circuit Court of Appeals confirm this reading of the Hobbs Act. *United States v. Capo*, 817 F.2d 947 (2d Cir.1987) (in banc), involved a job-selling scheme at the Rochester plant of

---

12. The color of official right doctrine embodies a special breed of extortion and the Third Circuit Court of Appeals has held where extortion by color of official right is charged, the Government need not prove the payment was obtained by force, fear or duress. *See United States v. Cerilli*, 603 F.2d at 425; *United States v. Kenny*, 462 F.2d 1205 (3d Cir.1972).

Eastman Kodak. In 1982, Kodak announced a new product line and needed approximately 2,300 new employees. Standard hiring procedures fell by the wayside in the scramble to fill these jobs. The defendants in Capo used their influence with a Kodak employment counselor to ensure individuals who paid them would be hired as Kodak employees.

The Second Circuit Court of Appeals, sitting in banc, reversed the Hobbs Act convictions of the defendants. The *Capo* court reasoned that fear of economic loss must be viewed from the victim's perspective and the victim must have reasonably believed "first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *Id.* at 951. While this language would seem to redound to the Government's benefit, the *Capo* court held the Kodak job-selling scheme was not extortion because the "victims" were "willing participants" in an attempt to obtain influence and improve their employment chances. *Id.* at 952. Elaborating, the *Capo* court described the payment by one witness of $500 for his wife's job as made "not out of fear that [co-defendant] would otherwise impair her prospects for employment at Kodak, but, rather, to achieve a result she had been unable to attain on her own." *Id.* at 953. The court concluded by reasoning "these 'victims' faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants" and therefore while the case presented a "classic example of bribery[,]" the evidence was insufficient to support a conviction for extortion. *Id.* at 954.

The viability of *Capo* was confirmed by the Second Circuit Court of Appeals a few years later in *United States v. Garcia*, 907 F.2d 380 (2d Cir.1990). In *Garcia*, a New York Congressman, emphasizing the influence he wielded with various government agencies, suggested to a corporation interested in obtaining contracts with those agencies that it

hire his wife as a public relations consultant. After considering the Government's argument that this request was an implicit threat given the corporation's dependence on continued political influence, the *Garcia* court concluded the Congressman could not be guilty of extortion. "The central fact is clear[,]" the court wrote: "even in the face of Garcia's disgraceful request for money, Wedtech [the corporation] was not risking the loss of anything to which it is legally entitled. Wedtech would still be permitted to bid on government contracts." *Id.* at 383–84.[13] *See also United States v. Rabbitt*, 583 F.2d 1014, 1027 (8th Cir.1978) (vacating extortion conviction because architectural firm was a "willing collaborator who sought and paid for [state legislator]'s good words to influential people" in order to obtain state contracts and there was no evidence firm believed it could not obtain state contracts without legislator's intervention).

Similarly, Corrado stood to lose nothing to which he was legally entitled had he rebuffed Albertson's venal request for a football-team sponsorship. In paying Albertson, Corrado's chances to see Applewood Farms to completion would likely improve; like the alleged victims in *Capo*, Corrado paid because he wanted to enhance his lot. *See Capo*, 817 F.2d at 954. Like the payor in *Garcia*, Corrado would still be permitted to pursue the various approvals and permits needed for Applewood Farms. *See Garcia*, 907 F.2d at 383–84.

The Government counters this reasoning with two cases, *United States v. Kattar*, 840 F.2d 118 (1st Cir.1988), and *United States v. Castillo*, 965 F.2d 238 (7th Cir.1992), in an attempt to demonstrate that even if the victim receives something of value, the defendant may nevertheless be guilty of extortion. In *Kattar*, the Church of Scientology ("the Church") was to pay Kattar $100,000 for any negative information—be it true or false—he could unearth regarding an attorney considered by the Church to be an enemy of Scien-

---

13. The *Garcia* court also wrote the Congressman was "in effect offering to sell his congressional power, but he was not using that power as a way to intimidate Wedtech[]" and "[b]y paying the Garcias, Wedtech was purchasing an advocate, not buying off a thug." 907 F.2d at 384. Since

Albertson was attempting to intimidate Corrado by threatening to continue to wield his power to marshal opposition to Applewood Farms, the Court recognizes this presents a closer case than in *Garcia*.

tology. 840 F.2d at 120. The Church placed $33,000 in an escrow account with Kattar's intermediary, to be withdrawn by Kattar after he delivered information to the Church. *Id.* When the Church, dissatisfied with the lackluster information provided by Kattar, demanded its $33,000 back, Kattar threatened to tell the attorney he had been paid the money as a contract on the attorney's life. *Id.* Later, Kattar demanded the remaining $67,000 in exchange for more information; he threatened physical force in retribution if the Church double-crossed him in any way, and he reiterated his threat to go to the attorney if he did not receive the money. *Id.* at 121–22.

Kattar argued he could not be found guilty of attempted extortion for his economic threats to the Church because he was entitled to the money he demanded under the terms of his deal with the Church. *Id.* at 122. Kattar's threats were unlawful, the court reasoned, because Kattar's deal with the Church—a deal for information that could be used to "defame, ridicule and discredit" the attorney—was "an illicit and unenforceable pact." *Id.* at 124. Accordingly, the First Circuit Court of Appeals upheld Kattar's conviction for extortion under the Hobbs Act. *See also United States v. Sturm,* 870 F.2d 769, 773 (1st Cir.1989) (affirming extortion conviction of debtor who demanded payment in return for relinquishing collateral the creditor later learned it had failed to repossess because "debtors have no right to charge creditors a fee for 'locating' collateral.").

*Kattar* demonstrates, argues the Government, that a transaction can be extortionate even if the defendant is offering something of value to the victim. Indeed, the Government notes, the *Kattar* court described the instruction to the jury—"there was no extortion of the $33,000 if ... the Church wanted information incriminating [the attorney] regard-

less of its truth or falsity—as an error in Kattar's favor." *Id.* at 125. But *Kattar* is distinguishable in that Kattar was offering nothing of value to the Church because the underlying contract was "illicit and unenforceable." The Government does not press here that the underlying contract between Albertson and Corrado—a resolution of their political and legal disputes—is similarly unenforceable as a matter of public policy. Indeed, settlements of genuine political and legal disputes are encouraged, so long as the underlying dispute is genuine. And as the testimony from Albertson above reveals, there is no indication his political opposition to Applewood Farms was anything but genuine.[14]

In *Castillo,* the Seventh Circuit Court of Appeals was confronted by a post-conviction motion for a new trial from Castillo, who alleged his trial lawyer had failed to represent him effectively. 965 F.2d 238, 239 (7th Cir.1992). The facts in *Castillo* were that a newspaper publisher was publishing articles critical of a leader of a local service organization in Chicago; the leader would plead with the publisher whenever she met him to stop publishing the articles. Finally, the publisher called the leader and promised her he would refrain from publishing articles critical of her if she paid him; the publisher and Castillo, who acted as an intermediary, were represented by the same lawyer and were ultimately convicted of extortion.

Castillo argued his joint representation prejudiced him; to evaluate this claim, the appellate court outlined the pros and cons of joint representation versus separate representation. Joint representation would have been preferable, the *Castillo* court, writing through Judge Posner, concluded, if the best defense would be to depict the deal between the publisher and the local leader as a legitimate transaction. But this defense would

---

14. For example, as rehearsed earlier in this opinion, Albertson told Corrado:

   You know, like I said, I don't think it's good idea [the Applewood Farms project]. You've got your own reasons. You'll make some money from it, I mean that's your reasons for coming into Camden and doing something there. You've got land, you've got two pieces of land, you know those are all your reasons. *I'm truly*

   *100% against it.* But, if you do what you're going to do and sponsor my football team, I'll not stand in your way anymore, and I will show you after your check clears the bank or whatever, how to let me walk out of this whole thing where neither one of us are put up on a pedestal that makes both of us look bad.

   Transcript of GX–2 (emphasis added).

have been futile, Judge Posner decided; "the 'transaction' was not the sale of a business." *Id.* at 241. Instead, he wrote, "[i]t was blackmail, a standard form of extortion." *Id.* (citation omitted). The deciding factor, the *Castillo* court wrote, was that the publisher had approached the leader in an effort to sell silence. "Had [the local leader] taken the initiative in seeking to exchange money for forbearance to publish, this would not be a blackmail case[,]" Judge Posner wrote. "It is a grave violation of journalistic ethics," he explained, "but it is not blackmail (or extortion), passively to accept an offer of payment in exchange for silence." *Id.* (citations omitted).[15]

*Castillo* dictates the denial of Albertson's motion, the Government argues. In *Castillo*, the victim received something "of value"— she would be free from critical newspaper articles about her, something to which she had no legal entitlement. Similarly, although Albertson had a legitimate right to oppose the Applewood Farms project, under *Castillo*, he could not use that right to extract money from Corrado in exchange for forbearance.

*Castillo* is the Government's strongest case, although its statements regarding the elements of extortion are *dicta.*[16] It presents what most think of as a classic form of blackmail—a demand for money pursuant to a threat to disclose disgraceful or embarrassing information.[17] *See* Richard A. Posner, *Blackmail, Privacy, and Freedom of Contract,* 141 U. Pa. L. Rev. 1817, 1830 (1993). This case deviates from the classic form in *Castillo*, of course, and catapults the Court into the line-drawing aspect of Hobbs Act jurisprudence. While *Castillo* is persuasive, the line-drawing of the "level playing field"

analysis contained in *Collins, Capo,* and *Garcia* is better suited to what has occurred here. Accordingly, the Court declines to follow *Castillo*.

2. *The Government's second argument: Albertson committed extortion because his behavior was covert and aimed at personal enrichment—Viacom distinguished.*

The Government draws two distinctions between what Albertson has done and what the corporate raider did in *Viacom*. First, the Government notes, the corporate raider in *Viacom* bargained openly and publicly with the corporation that was the subject of the takeover bid; the negotiations between Albertson and Corrado, on the other hand, were furtive and clandestine. Second, the Government argues, some economists theorize the public reaps a benefit when a corporate raider engages in greenmail, *see Viacom*, 946 F.2d at 1000–02; in contrast, Albertson's demand was designed for his own personal benefit. According to the Government, a rational reading of Hobbs Act jurisprudence can simultaneously pardon the corporate raider while doom Albertson.

■ The Court recognizes the Hobbs Act necessitates some degree of judicial line-drawing. These are two lines, however, the Court is not inclined to draw. First, the Government has not pointed to any case drawing a distinction between public threats and threats cloaked in secrecy, nor has the Court found such a case. A furtive threat may be more effective and thus more common than a publicized threat, but there is

---

**15.** Compare *Evans v. United States,* 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), in which a majority of the Supreme Court held, over a vigorous dissent, a public official need not initiate a transaction in order to be found guilty of extortion under the Hobbs Act; passive acceptance of bribes will suffice. Justice Stevens, for the Court, wrote "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268, 112 S.Ct. at 1889.

**16.** The Seventh Circuit has held elsewhere, however, a party need not give up something to which he is legally entitled to be a victim of extortion. *See United States v. Schmidt,* 760 F.2d 828, 831 (7th Cir.1985).

**17.** There is a separate federal statute prohibiting blackmail. 18 U.S.C. § 873 recites: "Whoever under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year or both."

nothing in the Hobbs Act which criminalizes one and excuses the other.

The second distinction the Government invites this Court to seize is the distinction between economic threats designed for public benefit and those designed for personal enrichment. This distinction is essentially found in the Model Penal Code. Article 223.4 of the Model Penal Code, entitled "Theft by Extortion," best illustrates the Government's position. This section provides:

A person is guilty of theft if he purposely obtains property of another by threatening to:

. . . . .

(5) bring about or continue a strike, boycott or other collective unofficial action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act

. . . . .

As Albertson sought remittance not for the CCC or its cause, but his own semi-pro football team, his conduct would seem to fit squarely within the definition of theft by extortion in the Model Penal Code.

While the Model Penal Code presents appealing support for the Government's position, its major weakness is it provides no precedential value. *Cf. United States v. Agnes,* 753 F.2d 293, 299 (3d Cir.1985) (rejecting general claim-of-right defense to extortion prosecution even though such a defense is found in Model Penal Code, § 223.1(3), because Model Penal Code is not binding in this jurisdiction and not persuasive in this case). With the exception of one district court case, which assumed without discussion that a defendant violated the Hobbs Act by threatening to picket stores if he were not given a pay-off, *see United States v. Quinn,* 364 F.Supp. 432 (N.D.Ga. 1973), the Court has been unable to find any cases interpreting the Hobbs Act which essentially adopt the position of subsection 5 of Article 223.4 of the Model Penal Code.

The Court declines to follow *Quinn.* Congress could have amended the Hobbs Act to

criminalize that spelled out in the Model Penal Code if it so desired. The Government is implicitly requesting the Court to equate the Hobbs Act with section 5 of Article 223.4 of the Model Penal Code. That task is properly left to Congress, not the courts.

**E.  Conclusion**

Both the Government and Albertson find support for their respective arguments in the broader statements made by courts of the different circuits as they interpret the Hobbs Act. As shown above, courts in the Second and Sixth Circuits have made pronouncements which favor Albertson's position that no conviction for extortion can lie when the payor has received something "of value" in return, while the Government can point to the jurisprudence of the First and Seventh Circuits, which have adopted a different reading of the Hobbs Act. The Third Circuit Court of Appeals has yet to provide a definitive answer. In this area of federal law, the legality and illegality of conduct turns on the peculiar facts of each case. The facts of a particular case may be egregious enough to constitute a violation under either the Government's or Albertson's formulation of law under the Hobbs Act.

Tying the law to the facts of each case necessitates judicial line-drawing. All can agree the Hobbs Act has been expanded to cover conduct beyond that contemplated by Congress in drafting the statute. The question then becomes: what is a principled basis for drawing the line between legality and illegality? Further, is not a criminal defendant entitled to fair warning his conduct will transgress that line? [18] Consider the following series of hypotheticals, and whether the conduct is violative of the Hobbs Act.

(1) Assume a land developer and civic association have become embroiled in sundry political and legal disputes over a proposed development project. It is not uncommon (indeed, it has become the norm) for developers to meet with civic associations and their leaders to ascertain what the developer must

---

18. Due to the holding in this case, the Court need not address Albertson's argument premised

on the rule of lenity.

provide in order to assuage resistance so as to obtain the necessary permits more easily. Thus, if a civic association (through its leaders, of course) demands that certain lands be devoted to public purposes in exchange for dropping opposition to a development project, are the leaders guilty of a Hobbs Act violation? I think not. If a civic association successfully defeats a developer's proposal, and then approaches a developer and requests lands for public use in exchange for supporting reapplication, is that a Hobbs Act violation? Again, I think not. The line is clear. But consider the following variations:

(2) The same civic association, having flexed its political muscle and quashed the efforts of the developer, now publicly insists upon land to be used for any purpose determined by the association—not necessarily for the public good. The association couples this demand with a condition the developer provide a sum of money (say, $100,000), again to be used by the civic association for its own purposes.

(3) Same facts as above, but the negotiations are conducted secretly.

(4) Same facts as above, but this time the leaders of the civic association secretly offer (a) to drop their personal political and legal opposition to the development project, with the knowledge the association's resistance will flounder and perhaps fold without their involvement, and (b) move behind the scenes to promote the development project, in exchange for $100,000.[19]

(5) Same facts as above, but the leaders retain an attorney, who meets with the attorneys for the developer. After a stylized negotiation dance, the parties reach the same agreement as above.

It is apparent hypotheticals (2) through (4), and perhaps (5), inch progressively closer to, and some would argue cross, the line separating lawful bargaining from extortion. As noted earlier, the Government suggests there are two principled bases for distinguishing between lawful bargaining and extortion: (1) lawful bargaining is generally not conducted secretly, but publicly; and (2) the aim of lawful bargaining is the public good, not private purse strings. But as explained earlier, secrecy and public benefit are nowhere to be found in the Hobbs Act or the jurisprudence interpreting the Hobbs Act. Nor is the Court prepared to state these are principled bases for distinction in construing the Hobbs Act.

In sum, Albertson's "proposition" was disgraceful, offensive, and ethically repugnant. But the Hobbs Act does not police all disgraceful, offensive, and ethically repugnant behavior; it only prohibits the "wrongful" use of economic fear. Because Corrado stood to receive something "of value" in return for his $20,000 sponsorship, Albertson's economic threats were not wrongful and not violative of the Hobbs Act. Accordingly, an appropriate order will follow, granting Albertson's motion for judgment of acquittal as a matter of law.

### F. Motion for New Trial

Albertson's motion for a new trial is premised on alleged errors in the jury instructions. The jury instructions are inextricably linked to the merits of the motion for judgment of acquittal, which has been granted. This obviates any necessity to address the jury instructions at this time. Should the appellate court conclude the acquittal motion was erroneously granted and the jury instruction was also erroneous, any aid from that court with respect to appropriate language for a jury instruction would be most welcome.

---

**19.** This hypothetical most closely resembles what happened in this case and is embodied in the Model Penal Code.